Lucas E. Gilmore, Bar No. 250893
Reed Kathrein, Bar No. 139304
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email:  lucasg@hbsslaw.com
        reed@hbsslaw.com

*Attorneys for Lead Plaintiff George Lang*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LUNA INNOVATIONS INCORPORATED SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>*ALL ACTIONS* | Master File No. 2:24-cv-02630-CBM-KS<br><br>**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT**<br><br>Date: March 11, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8D (8th Fl.)<br>Judge: Hon.  Consuelo B. Marshall<br>350 W. 1st Street<br>Los Angeles, CA 90012 |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................... 1

II.  SUMMARY OF THE FRAUD ..................................................................... 3

    A.  Luna and Its Executives ................................................................. 3

    B.  Luna's Reporting Obligations ......................................................... 4

    C.  Luna's Reported Revenue Growth During the Class Period ................................................................................................. 4

    D.  The Truth Begins to Emerge ........................................................... 7

    E.  Luna Continues to Stonewall NASDAQ, the Public, and its Investors. ....................................................................................... 9

III.  LEGAL STANDARD .................................................................................. 10

IV.  THE COMPLAINT ALLEGES ACTIONABLE MISREPRESENTATIONS ........................................................................ 10

    A.  The Complaint Adequately Alleges Three Categories of Misstatements ............................................................................... 10

        1.  Defendants' Admissions that Financial Performance Statements Were False Satisfies Falsity Requirement ................................................................. 11

        2.  Defendants Misrepresented and Concealed Material Adverse Facts Regarding the Drivers and Sources of Luna's Revenues ......................................................... 14

            a.  Partial truths are actionable ........................................... 14

            b.  Plaintiff did not engage in improper "puzzle pleading" ....................................................................... 15

            c.  Defendants' Statements Regarding the Drivers and Sources of Luna's Revenues Were Not Puffery ....................................................... 16

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

3.  The SOX Certifications and False Assurances of Internal Controls Are Actionable ............................................. 18

B.  Defendants' Forward-Looking Statements Are Not Protected by the PSLRA Safe Harbor................................................ 20

V.  THE COMPLAINT ADEQUATELY ALLEGES AN INFERENCE OF SCIENTER........................................................................ 22

A.  The Simplicity and Obviousness of the Accounting Violations and Scope of the Required Restatement Support Scienter .............................................................. 23

B.  The Timing of the Individual Defendants' Departures Strongly Support Scienter ................................................. 25

C.  Graeff's Failure to Cooperate with the Internal Investigation Supports Scienter ........................................... 27

D.  Luna's Decision to Avoid Providing Future Financials Is Relevant to Scienter .................................................. 28

E.  Defendants Held Themselves Out as Knowledgeable Regarding Luna's Revenues ................................................ 29

F.  Defendants Had Access to the Disputed Information........................ 30

G.  The Core Operations Doctrine Supports Scienter............................. 31

H.  Viewing Allegations Holistically, Defendants' Innocent Inference Fails.......................................................... 32

VI.  THE COMPLAINT ADEQAUTELY ALLEGES SCHEME LIABILITY ...................................................................... 32

VII.  PLAINTIFF PLAUSIBLY ALLEGES CONTROL LIABILITY. .............. 35

VIII. CONCLUSION .......................................................... 36

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...........................................24, 26, 27

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
2024 WL 4647297 (S.D. Cal. Oct. 31, 2024)........................................................ 13

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021).................................................................................... 22

*In re Amer. Apparel, Inc. Shareholder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ................................................35, 36

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................. 11

*Bielousov v. GoPro, Inc.*,
2017 WL 3168522 (N.D. Cal. July 26, 2017) ...................................................... 29

*Bruce v. Suntech Power Holdings Co.*,
2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ...................................................... 19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
Tech, Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................ 20

*In re Comverse Tech., Inc.*,
2007 WL 4207191 (E.D.N.Y. Oct. 31, 2007) .......................................31, 33, 34

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y.)........................................................................... 33

*Comm's Workers of Am. Plan for Emps. Pensions & Death Benefits*,
2007 WL 951968 (D. Ariz. Mar. 28, 2007) ......................................................... 28

*In re CV Therapeutics, Inc.*,
2004 WL 1753251 (N.D. Cal. Aug. 5, 2004)........................................................ 21

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001)...................................................................11

*In re Diamond Foods, Inc., Sec. Litig.*,
  2012 WL 6000923 (N.D. Cal. Nov. 30, 2012).........................................................23

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)...............................................................................36

*Ezzes v. Vintage Wine Estates, Inc.*,
  2024 WL 895018 (D. Nev. Mar. 1, 2024)................................................................24

*Fouad v. Isilon Sys., Inc.*,
  2008 WL 5412397 (W.D. Wash. Dec. 29, 2008).....................................................26

*Fresno Co. Emps. Ret. Assoc. v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ....................................................................13

*Garcia v. J2 Glob., Inc.*,
  2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) .........................................................30

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024).................................................................................33

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)................................................................................10

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023).............................................................................10, 22

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) (en banc)..................................................................19

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)........................................................29

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ...............................................................21, 22

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008)..................................................................17

*In re Impax Labs., Inc. Sec. Litig.*,
  2007 WL 7022753 (N.D. Cal. Jul. 18, 2007).....................................................17, 25

-iv-

*In re Intelligroup Sec. Litig.*,
 527 F. Supp. 2d 262 (D.N.J. 2007)...................................................................27

*In re Intuitive Surg. Sec. Litig.*,
 65 F. Supp. 3d 821 (N.D. Cal. 2014)................................................................15

*Kaltman v. Key Energy Services, Inc.*,
 447 F. Supp. 2d 648 (W.D. Tex. 2006).......................................................*passim*

*Katz v. Image Innovations Holdings, Inc.*,
 542 F. Supp. 2d 269 (S.D.N.Y. 2008).........................................................27, 28

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018).........................................................................14

*Kovtun v. VIVUS, Inc.*,
 2012 WL 4477647 (N.D. Cal. Sept. 27, 2012)................................................30

*Lemen v. Redwire Corp.*,
 2023 WL 2598402 (M.D. Fla. Mar. 22, 2023)................................................19

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
 416 F.3d 940 (9th Cir. 2005).........................................................................22

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016).......................................................................10

*Lorenzo v. S.E.C.*,
 587 U.S. 71 (2019) ......................................................................................32

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) ......................................................................................10

*In re Medicis Pharm. Corp. Sec. Litig.*,
 2010 WL 3154863 (D. Ariz. Aug. 9, 2010) ....................................................23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
 527 F. Supp. 2d 1164 (C.D. Cal. 2007)................................................25, 27, 31

*In re Monster Worldwide, Inc. Sec. Litig.*,
 251 F.R.D. 132 (S.D.N.Y. 2008)....................................................................11

*Mulligan v. Impax Labs., Inc.*,
 36 F. Supp. 3d 942 (N.D. Cal. Apr. 18, 2014) ...........................................16, 17

-v-

*In re National Golf Props., Inc.*,
   2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ........................................... 12, 35

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
   2016 WL 6782768 (C.D. Cal. Aug. 9, 2016) ................................................... 34

*Patel v. Axesstel, Inc.*,
   2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ................................................... 23

*Petrie v. Elec. Game Card, Inc.*,
   2015 WL 475958 (C.D. Cal. Feb. 5, 2015) ...................................................... 35

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................ 11, 14

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2021 WL 8153575 (N.D. Cal. Sept. 16, 2021) ................................................ 12

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ................................................................ 20, 21

*Rabkin v. Lion Biotechnologies, Inc.*,
   2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................... 31, 32

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ................................................................ 29, 30

*Richard v. Northwest Pipe Co.*,
   2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ............................................. 26

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ............................................. 11, 16

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................ 31, 32

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .................................................. 25

*Santa Fe Indus. V. Green*,
   430 U.S. 462 (1977) .................................................................................... 19

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................................... 22

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

*In re Scottish Re Group Sec. Litig.*,
    524 F.Supp.2d 370 (S.D.N.Y.2007) ........................................................................ 34

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ................................................................................ 35

*In re Silicon Storage Tec., Inc. Sec. Litig.*,
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ........................................................... 19

*In re Sipex Corp. Sec. Litig.*,
    2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ........................................................ 26

*In re Spectrum Pharms. Inc.*,
    2015 WL 1413385 (D. Nev. Mar. 26, 2015) ...................................................... 15, 16

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ............................................................................................... 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .......................................................................................... 22, 32

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................. 23

*Uniformed Sanitationmen's Assoc. Comp. Fund. v. Equinix, Inc.*,
    2025 WL 39936 (N.D. Cal. Jan. 6, 2025) .............................................................. 31

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................... 26

*In Re Vaxart, Inc. Sec. Litig.*,
    576 F. Supp. 3d 663 (N.D. Cal. 2021) .................................................................... 15

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................. 10, 22

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .................................................................................... 10

*In re WatchGuard Sec. Litig.*,
    2006 WL 8473541 (W.D. Wash. Apr. 21, 2006) .................................................... 23

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ................................................................................ 19

-vii-

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)...................................................................................26

**Statutes**

15 U.S.C. § 78u–4(b)(1) ..........................................................................................19

**Other Authorities**

17 C.F.R. § 240.10b-5(a), (c) ...................................................................................32

## I.   INTRODUCTION

Defendants' motions to dismiss pose a simple question: can Defendants evade liability for a years-long fraudulent accounting scheme based on Luna's refusal to release the Company's financial restatements, its refusal to disclose the results of its internal investigation, and its refusal to come clean about Defendants' intentional misconduct?[1] The emphatic answer must be no. This case should not set a precedent that securities fraud defendants can deliberately withhold information about their wrongdoing, run the Company's business and share price into the ground, get delisted from an national stock exchange and escape liability under the securities laws by concealing the facts from public view.

By Luna's own admission, its management inflated Luna's revenue for nearly two years – spanning from the first quarter of 2022 through the third quarter of 2023. Following this period, Luna has withheld the release of all financial statements. The Company has also ceased all conferences with analysts and investors, including refusing to hold its required annual shareholders' meeting.[2]  As a result of its stonewalling, Luna's share price has cratered and Nasdaq has delisted Luna from its exchange. *Id*. Shareholders are now left with a pitiful penny stock that can now only be traded over the counter (*id*.), and whatever funds are left over to compensate the class are being depleted daily.

Luna has further admitted to classic accounting fraud - the continual practice of improper revenue recognition. On March 12, 2024, a "Special Committee" announced certain revenue "did not qualify for revenue recognition" under GAAP

---

[1] "MTD" refers to Defendants Luna and Graeff's Motion to Dismiss (ECF No. 70); "G-Q MTD" refers to Defendant Gomez-Quintero's Motion to Dismiss (ECF No. 71); and "Nestro MTD" refers to Nestro's Motion to Dismiss (ECF No. 73).

[2]    *See*    Jan.    3,    2025    Form    8-K,    *available    at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001239819/000123981925000 008/luna-20250103.htm (1/3/25 8-K).

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

rules, and the Company "has identified material weaknesses in its internal control over financial reporting . . . and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of these dates." ¶ 93.[3]   Luna's entire leadership team was swiftly shown the door, with Defendant Graeff's abrupt resignation 13 days after the Committee's formation, followed by the departure of Luna's CFO (Defendant George Gomez-Quintero), the termination of Brian Soller, the Chief Technology Officer and Executive Vice President, and the firing of seven additional employees.  ¶¶ 12-14, 105.  The Board withheld compensation from Graeff for "Cause" based on his refusal to participate in the Board's internal investigation. ¶ 107. Shortly thereafter, Interim President and Executive Chairman, Richard Roedel, left purportedly "due to health reasons, effectively immediately." ¶ 110.  Eleven days later, Roedel "retired" from the Board altogether. ¶ 111.

Rather than acknowledging this longstanding fraud, Defendants conjure an alternate reality in which these developments are simply a series of innocent mistakes that they are diligently trying to correct.  MTD at 9-11. They further assert the financial statements Luna has admitted were materially false when made are inactionable because they are subject to an upcoming restatement. MTD at 15-16. After filing their motion, however, Luna now *admits* that no such restatements are forthcoming.  *See* 1/3/25 8K ("the Company no longer expects to file its previously disclosed delinquent periodic reports with the SEC.").  Plaintiffs have plainly established falsity.

Defendants' scienter challenges are equally specious. Plaintiff plausibly pled a strong inference of scienter based on, among other facts: (i) Luna's own admissions of longstanding improper revenue recognition practices; (ii) the abrupt departure and terminations of Luna's top executives, including Defendant Graeff

---

[3] All "¶" citations are to Plaintiff's Amended Consolidated Class Action Complaint, ECF No. 67.

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

who refused to cooperate with the Company's internal investigation; (iii) Luna's refusal to issue financial restatements (or any financial statements at all) for the past *three years*; (iv) its admitted lack of internal controls; and that (v) given the materiality of the revenue inflation concerning the Company's core operations it would be absurd to suggest Defendants were unaware of the inaccuracies. *See* infra § V.  Plaintiff also plausibly alleges Defendant Graeff's scienter based on his actual access to information about the fraud, and his prominent role in propagating the fraud on shareholders. *See* infra § V.E.

For their part, Defendants Nestro and Gomez-Quintero argue their roles as CFOs during the Class Period, and their responsibilities in verifying the accuracy of the quarterly statements and making false statements about the Company's revenue, are not sufficient to establish scienter. *See* G-Q MTD at 8-10; Nestro MTD at 2-4. These arguments rely on a distorted reading of the complaint's allegations, which include the suspicious timing and circumstances surrounding their departures, the Board's internal investigation, and Luna's admission that all financial statements during the Class Period during their reign were false. *See* infra § V.A-B. These facts strongly support scienter. *See Kaltman v. Key Energy Services, Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006).

Taken as a whole, these allegations paint an unmistakable picture of a failed company crumpled by the weight of a yearslong deceit, with Defendant Graeff at the helm, aided by his top lieutenants, Defendants Nestro and Gomez-Quintero.

Defendants' motion to dismiss should be denied.

## II.    SUMMARY OF THE FRAUD

### A.    Luna and Its Executives

Luna positions itself as a global leader in fiber optics, offering a comprehensive range of test, measurement, and control products for this field. ¶ 20. At all relevant times, the Company's common stock traded on the Nasdaq exchange under the ticker symbol "LUNA." ¶ 11.

-3-

Defendant Scott Graeff served as Luna's CEO and President from prior to the Class Period until March 25, 2024, when he was abruptly terminated. ¶ 12. Defendant Eugene Nestro served as the Company's Chief Financial Officer from prior to the Class Period until October 16, 2023. ¶ 13. Defendants George Gomez-Quintero served as Luna's CFO beginning on October 17, 2023 until he resigned on May 1, 2024. *Id.*

**B.    Luna's Reporting Obligations**

As a publicly traded company, Luna is subject to stringent SEC reporting requirements, including filing its periodic financial reports. ¶ 25. These reports are crucial for companies to maintain transparency and attract investors. *Id*. They provide valuable insights into a company's financial health, allowing stakeholders to make informed decisions. *Id*. The annual report, which is the most significant, offers a comprehensive overview of the company's performance, audited by independent public accountants to ensure accuracy and reliability, as mandated by the Sarbanes-Oxley Act. ¶ 26.

Luna's failure to timely file reports constitutes a violation of the Exchange Act, potentially leading to SEC sanctions, including trading suspensions and registration revocation. ¶ 28. Nasdaq also has strict policies regarding late filings, and initiates delisting procedures if a company fails to comply with its plan to become current. ¶ 29. Delisting carries significant consequences, including a halt in trading and a negative impact on the company's reputation. ¶ 30.

**C.    Luna's Reported Revenue Growth During the Class Period**

The Class Period begins on May 16, 2022, when Defendants announced Luna's financial results for the first quarter of fiscal year 2022, ending on March 31, 2022. ¶32. Defendants emphasized Luna's quarterly total revenues of $22.5 million, which was above the first quarter guidance range Defendants published the previous quarter and represented a 7% increase from the same quarter last year. *Id*.  In Luna's press release and at the earnings call, Defendants attributed Luna's revenue growth

-4-

to the Company's strategic decisions such as its recent acquisition of distributed temperature sensing company Lios and its sales execution, including "record sales for Luna's high speed communications test instruments, the OVA and OBR." ¶ 37.

Luna's Q1 2022 quarterly report attached Sarbanes-Oxley ("SOX") certifications signed by Defendants Graeff and Nestro, assuring investors that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." ¶ 40. The SOX certifications also assured investors Luna's disclosure controls and procedures and internal control over financial reporting "provide[s] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]" ¶ 41. In the 1Q22 Report, Graeff and Nestro separately assured investors that the Company's disclosure controls and procedures are "effective." *Id*.

Thereafter, Luna reported sequential quarterly revenue growth over the next three quarters, booking $26.2 million in Q2 2022, $29.2 million in Q3 2022 and a record $31.7 million in Q4 2022.  ¶¶43, 52, 59. While Luna experienced a dip in Q1 2023 revenues of $25 million, this still represented 11% year over year increase. ¶72. Moreover, it was apparently only a temporary setback, as Company quickly rebounded in Q2 2023 by reporting $29.2 million in revenues and $30.7 million in Q3 2023. ¶¶78, 85.

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS



Each quarter, in Luna's press releases and on earnings calls, Defendants continued to attribute the revenue growth trend to organic factors such as Luna's management team's "focus and execution," "strong demand for legacy Luna products," and ability to "achieve these strong financial results while still navigating a challenging supply chain and economic environment." ¶¶ 45, 47 53. For each quarterly report during Nestro's time as CFO, Defendants Graeff and Nestro signed SOX certifications and assured investors that Luna's disclosure controls and procedures were effective. ¶¶ 40, 49, 56, 65, 75, 82.  When Defendant Gomez-Quintero replaced Nestro as CFO, Defendants Graeff and Gomez-Quintero signed a comparable SOX certification for the last quarter in the class period (3Q23) and assured investors that Luna's disclose controls and procedural were effective. ¶ 89.

Overall, throughout the Class Period, Defendants' statements portrayed Luna as a Company experiencing strong sustainable revenue growth that was on track to continue on a growth trajectory.  Consequently, Luna's stock price doubled from

May 16, 2022 to June 16, 2023, reaching a class period high of $10.56 per share and market capitalization of nearly $350 million.



Unbeknownst to investors, however, Defendants' statements were materially false and misleading, causing Luna's stock to be artificially inflated.  While touting Luna's financial results and internal controls, Defendants omitted to disclose that: (1) Luna's reported financial results contained unearned revenues that should not have been recognized; (2) Luna would need to restate these financial statements results; (3) Luna's disclosure controls and procedures did not provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (4) Luna's disclosure controls and procedures were not effective; and (5) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all times.  ¶¶ 42, 51, 58, 68; 71, 77, 84, 91.

**D.     The Truth Begins to Emerge**

On March 12, 2024, Luna announced it needed to restate its financial statements for the second and third quarters of 2023.  ¶ 92.  According to Luna, a

"Special Committee of the Board of Directors" conducted an independent review, "with the assistance of external legal and financial advisors," and determined that certain recognized revenue on its SEC reports "did not qualify for revenue recognition under U.S. generally accepted accounting principles." ¶ 93. As a result, the 2Q and 3Q 2023 financials "should no longer be relied upon and should be restated." *Id.* Further, as a result of the independent review, "the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023, and September 30, 2023, and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of those dates." *Id.* On that same day (March 12, 2024), Luna also announced that it would be unable to file its annual Form 10-K for the fiscal year ending December 31, 2023.

On this news, the price of Luna Innovations plummeted 35% over a single trading day. ¶ 96.

Less than two weeks later, on March 25, 2024, the Company announced that Defendant Graeff had "retired," effectively immediately. ¶ 97. The Company connected Graeff's departure with the ongoing independent investigation, stating that under Graeff's separation agreement he was required to cooperate with the Company in connection with "any investigation of any claims or demands asserted against it and with respect to matters arising from events that occurred during his period of employment with the Company." *Id.*

On this news, the price of Luna Innovations stock fell another 11% over a single trading day. ¶ 98.

On April 8, 2024, Luna announced that Nasdaq had sent deficiency notice regarding Luna's failure to timely file an annual report with the SEC. ¶ 99. Then, on April 19, 2024, Luna announced that, in addition to non-reliance on its 2Q23 and 3Q23 Reports, investors should no longer rely on its previously filed financial statements contained in its 1Q22, 2Q22, 3Q22, FY22, and 1Q23 Reports because the Company improperly recognized revenues in each of these Reports as well.

-8-

¶ 100.  Luna further noted "any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon." *Id.*

As the market absorbed this information, this news drove the price of Luna shares down another 28.1% over the next four trading days. ¶ 102.

**E.     Luna Continues to Stonewall NASDAQ, the Public, and its Investors.**

To this day Luna has never disclosed what needs to be restated, how much or why.  Luna's management continues to refuse to file its restated financials for the impacted period, declines to release the findings and conclusions of its internal investigation, and has ceased reporting of its ongoing financial results. Gilmore Dec. ¶ 1, Ex. 1.

Ultimately, Luna did not even attempt to comply with its filing obligations. According to Luna's January 3, 2025 Form 8-K,  on December 23, 2024 (13 days after Defendants filed their motions to dismiss), Luna disclosed that it "no longer expects to file its previously disclosed delinquent periodic reports" with the SEC. Luna further acknowledged that it failed to hold a shareholding meeting for the entirety of 2023, a further violation of Nasdaq's Listing Rules.  As a result, "the Company's common stock will be suspended on Nasdaq and ultimately delisted, so the Company does not intend to present its views with respect to this additional deficiency to the Nasdaq Hearings Panel or take any additional action." *Id.*

As of the date of this opposition brief, Luna's shares are a penny stock that trades on the highly restricted and illiquid OTC market, where trades can only occur upon the specific buy or sell order of certain investors, brokers are prohibited from proactively offering these securities, and pricing and other trading information for these securities are not available to the general public. *Id.*

## III.    LEGAL STANDARD

In resolving a Rule 12(b)(6) motion, courts must "accept all factual allegations as true and view them in the light most favorable to Plaintiffs." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

To state a Section 10(b) claim under Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission (i.e., "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-39 (2011). Defendants challenge only the first two of these elements, falsity and scienter, both of which lack merit.

## IV.    THE COMPLAINT ALLEGES ACTIONABLE MISREPRESENTATIONS

A complaint alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is false and misleading if it gives investors the "impression of a state of affairs that differs in a material way from the one that actually exists." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). On a motion to dismiss, a court should dismiss the complaint "only if reasonable minds could not disagree that the challenged statements were not misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

### A.    The Complaint Adequately Alleges Three Categories of Misstatements

Defendants made material misrepresentations and omissions concerning:

(1)    ***Luna's financial performance***: Defendants' improper recognition of revenue allowed Defendants to materially inflate Luna's reported revenue and

-10-

misstate metrics dependent upon these figures when presenting Luna's financial performance for seven straight quarters. *Supra* § II.C; *see In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("[T]he existence of restated financial results is sufficient to support plaintiffs' belief that the statements were misstated.").

(2) ***The drivers for Luna's financial performance***: Defendants touted Luna's revenue results, attributing "double-digit" growth (¶ 47) to organic factors such as "strong demand for legacy Luna products," "record sales for Luna's high speed communications test instruments, the OVA and OBR," and the Company's "focus and execution ," giving investors a favorable impression of Luna's financial health. ¶ 47, 37, 45. To avoid misleading investors, the law obligated Defendants to concurrently disclose adverse information cutting against their positive statements; namely, that Defendants fabricated the results through improper revenue recognition. *See In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *13 (N.D. Cal. Aug. 17, 2022).

(3) ***Defendants' certifications***: Defendants falsely certified its compliance with GAAP, SOX, and maintenance of effective internal controls over its financial reporting. ¶¶ 40, 49, 56, 65, 75, 82, 89. *See, e.g.*, *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *10 (C.D. Cal. Feb. 27, 2015) ("false and misleading SOX and internal-control certifications" are actionable).

### 1. Defendants' Admissions that Financial Performance Statements Were False Satisfies Falsity Requirement

Defendants do not genuinely dispute that, at the very least, their statements about Luna's financial performance were false and misleading. Nor can they. Luna's announcement that it needed to restate its financials is an admission that they were materially false and misleading when made. *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 138 (S.D.N.Y. 2008) (defendant "effectively admitted the false and misleading quality of [statement] by announcing a restatement of its financial statements as a result of improper accounting"); *In re Atlas Air Worldwide*

*Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2004) ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made").

Defendants similarly concede the materiality of their misstatements. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.,* 2021 WL 8153575, at *3 (N.D. Cal. Sept. 16, 2021) (a "multiyear" restatement is one "of unquestionable materiality."). The sizable drop in Luna's stock price immediately following disclosure of accounting violations, the need to restate, and internal control weaknesses further supports materiality. *See* § II.C; *In re National Golf Props., Inc.*, 2003 WL 23018761, at *5 (C.D. Cal. Mar. 19, 2003).

Despite these admissions, Defendants Luna and Graeff claim the false financial performance statements are inactionable because they were the subject of an illusory restatement (which Defendants have confirmed will not be released). *See* MTD at 15-16. But Defendants cannot make the false statements disappear by suggesting they will eventually be corrected, particularly when Defendants have not restated and apparently never intend to do so.

In relying on future financial restatements that will never come, Defendants appear to be viewing this case through Alice's magical looking glass,[5] but courts have not been fooled by such delusions. For example, in *Kaltman*, plaintiffs alleged Key Energy, and several individual defendants, overstated the company's financial results, engaged in improper accounting practices, and failed to adopt internal controls. 447 F. Supp. 2d at 652-53. Key Energy had announced a write-down of $78 million was required, and it would have to issue one or more financial statements. But, as of the date of the opinion, "no such restatement has been filed

---

[5] "A dream is not reality, but who's to say which is which?" Carroll, L. (1909), *Through the Looking-Glass and what Alice found There* [N.Y. Dodge Pub. Co.].

by the company." *Id.* at 653. The company also announced that individual defendant Francis John (the CEO) was terminated for cause.

The court held the plaintiffs sufficiently plead false statements because the announcement of the need to restate its financials "constitutes an admission that its public filings are false." *Id.* at 648 (citing *In re Fleming Cos. Inc., Secs. & Derivative Litig.*, 2004 WL 5278716, at *25 (E.D. Tex. June 16, 2004)). The court also held plaintiffs pled materiality; indeed, "[t]here is no reasonable argument that could be made that the proposed restatement, even though it has not yet occurred, is anything other than a material one." *Id.* at 659 (quoting *Fleming*); *see also Fresno Co. Emps. Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) (announced need to restate financials constitutes admission as to their falsity and materiality; "[u]nder GAPP, 'previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued.'" (quoting *Atlas Air*, 324 F. Supp. 2d at 486). Luna's false financial statements were obviously material.

Defendant Gomez-Quintero argues his false statements regarding the attribution of revenue growth to Luna's "Comms Test business," and his false SOX certification for 3Q23, somehow also were not false. *See* G-Q MTD at 4-5. But Luna has *admitted* that these statements were false, and warned investors that any statements "describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon." ¶ 101. The disclosure encompasses both of Defendant Gomez-Quintero's false statements. Defendant Gomez-Quintero also contends he should not be liable for false statements that the Company and Defendant Graeff made before Gomez-Quintero joined the Company. G-Q MTD at 11-12. Plaintiff agrees, but identification of even one actionable misstatement made by Gomez-Quintero is sufficient to establish securities fraud liability. *See, Alger*

-13-

*Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 2024 WL 4647297, at \*13 (S.D. Cal. Oct. 31, 2024).

> **2.    Defendants Misrepresented and Concealed Material Adverse Facts Regarding the Drivers and Sources of Luna's Revenues**

> **a.    Partial truths are actionable**

The Complaint alleges Defendants misled investors by coupling their reported financial performance with positive statements explaining the drivers and sources of their reported financial performance, while simultaneously concealing that a material portion of the reported revenues had been improperly recognized. *See, e.g.,* ¶¶ 37, 45, 47. To avoid misleading investors, Defendants must disclose the full truth about their practice of improper revenue recognition. *See Plantronics,* 2022 WL 3653333, at \*13.

As the Ninth Circuit has held, "'once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018). By choosing to highlight to investors the purported drivers and revenue streams, Defendants were duty-bound to do so in a manner that did not mislead investors, including by disclosing known material adverse information affecting the viability of those revenues.

Defendants challenge these statements by contending the identified drivers and sources of the revenues were technically true as they did in fact contribute to Luna's financial performance.  MTD at 19-21.  But even accepting this counter-factual argument, technically true statements can be misleadingly when they conceal materially misleading information.  *See Plantronics,* 2022 WL 365333, at \*13 (defendants' statements were false when they misleading attributed positive revenue growth to "organic consumer demand and other factors" rather than improper sales practices).

-14-

### b. Plaintiff did not engage in improper "puzzle pleading"

Defendants feign ignorance as to which portion of the alleged false statements Plaintiff challenges, contending Plaintiff has engaged in "puzzle pleading" by including block quotes in the complaint, purportedly without explaining why the statements were false. MTD at 16. This is not accurate: after each series of false statements, the complaint describes why these statements were false, primarily because Luna *admitted* they were false. ¶¶ 42, 51, 58, 68, 71, 77, 84, 91. Nothing more is required. *See In re Intuitive Surg. Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (rejecting puzzle pleading challenge when plaintiffs detail falsity of each statement). And while Defendants complain about the "block-quoted statements" (MTD at 16), Plaintiffs do so to provide context; importantly, the ensuing paragraphs sufficiently identify the part of the representation Plaintiff challenges. *See In re Spectrum Pharms. Inc.*, 2015 WL 1413385, at *3 (D. Nev. Mar. 26, 2015) (approving use of block quotes).

Defendants also challenge certain false statements explaining the sources and drivers of Luna's financial performance by misleadingly citing to only snippets of the statements, without providing the fuller context. This is improper. *See In Re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) (in determining falsity, statements cannot be viewed in "complete isolation," but instead "in light of all the information then available to the market.") (quoting *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)).

For example, Defendants cite to a single sentence from August 11, 2022, where Defendant Graeff stated "[l]et's dig a little deeper in the sensing, which you may recall is where we use the fiber as the physical sensor to create smart materials and structures." MTD at 17 (citing ¶ 47). But Defendants omit the remaining portion of that paragraph, where Graeff went on to proclaim that "[r]evenues grew double-digit versus Q2 last year, driven both by a full quarter of LIOS as well as strong demand for legacy Luna products. In fact, Luna Legacy ODiSI, Hyperion and

-15-

terahertz pipelines each contributed double-digit sales growth." ¶ 47. This statement was misleading as it falsely attributed Luna's revenue growth to organic factors while omitting to disclose the improperly recognized revenue. ¶ 51.

Defendants again selectively quote Defendant Graeff's November 10, 2022 statement that "[t]oday, Luna Innovations is uniquely positioned to offer a breadth of solutions and capabilities in fiber technology." MTD at 17 (citing ¶ 53). Defendants omit the rest of the paragraph, including Defendant Graeff's false attribution of 40% revenue growth to his "team's" ability to "achieve these strong financial results while still navigating a challenging supply chain and economic environment." ¶ 53. His attribution of revenue growth to overcoming supply constraints is misleading, because of Defendant's undisclosed revenue inflation. ¶ 58.

Defendants repeat this fallacy throughout their motion. MTD at 17-18. They also do not address the false statements at the heart of this case, which falsity they have already admitted. *See id.* at 3-4.

### c. Defendants' Statements Regarding the Drivers and Sources of Luna's Revenues Were Not Puffery

Defendants' argument that certain alleged misrepresentations constitute nonactionable puffery also fails. *See* Mot. at 19-20. Once again, Defendants rely on snippets of the challenged statements that do not account for the fuller context, which is improper. *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. Apr. 18, 2014) ("When determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made.").

Here, Defendants' statements as to the sources and drivers of Luna's revenues conveyed a concrete state of affairs that materially differed from the one that actually existed, i.e., that Luna's reported financial performance and revenue growth were the product of organic factors and legitimate business practices and accounting. *See Roberti*, 2015 WL 1985562, at *9 (holding that certain statements "about the status

-16-

of specific products" were not puffery).   And "determining whether a given statement is material [i.e., not puffery] 'entail[s] fact-intensive assessments that are more properly left to the jury.'" *Impax Labs*, 36 F. Supp. 3d at 966 (some alterations original). Thus, a statement can only be characterized as puffery if it is "so 'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total mix of available information." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).

That is not the case here. For example, Defendants challenge Graeff's August 11, 2022 statement about being "pleased with the team's top-line performance and ability to navigate ongoing macroeconomic and market factors" (MTD at 20), but this excerpt must be read in light of Graeff's fuller statement, which claimed that Luna's sales team's "focus and execution" were the cause of revenue growth.  ¶ 45. This statement omitted to disclose that Defendants' practice of improper revenue recognition was a material driver for the revenue growth.  Likewise, Defendants challenge Graeff's May 9, 2023 statement that "[b]ecause of the foundational work we did in 2022, we've entered 2023 with an integrated organizational structure, proven systems, and best practices," (MTD at 20) but this statement was immediately followed by this sentence (omitted by Defendants): "With those pieces in place, we were able to achieve the top end of revenue guidance for the quarter." ¶ 73.  As alleged in the complaint, Luna's "achievement" of revenue guidance was based on improper revenue recognition – and certainly *not* based on Luna's adoption of best practices.

Likewise, on August 11, 2022, following release of its FY22Q2 results, Graeff stated in an earnings call that "[r]evenues grew double-digit versus Q2 last year, driven both by a full quarter of LIOS as well as strong demand for legacy Luna products. In fact, Luna Legacy ODiSI, Hyperion and terahertz pipelines each contributed double-digit sales growth."  ¶ 47.  Defendants frame this as mere puffery, but the statements are actionable because they neglect to disclose Luna's

financial reports contained unearned revenue that should not have been recognized. ¶ 51. Similarly, on March 14, 2023, Graeff stated "2022 was a transformational year for Luna representing the culmination of execution on the five-year strategic plan we outlined in 2017, thereby creating a pure-play fiber optics company." ¶ 60.  This statement is actionable because revenue growth in 2022 was not the result of a "transformational year" or the "execution on the five-year strategic plan," but instead was the result of a years-long fraudulent scheme to inflate revenue.  *See* ¶ 68.

Further, on March 12, 2024, when news of the fraud first came to light, Graeff stated that he was "unaware of how the revenue recognition discrepancy happened. 'If we knew how it happened or when it happened – this is being brought to light now and we're addressing it as we found out.'"  ¶ 95.  Thirteen days later, Graeff "retired."  ¶ 97.  The series of events surrounding his "retirement" make clear that Graeff was not "unaware" of the improper revenue scheme, but in fact was the prime instigator of it.  Indeed, Graeff's compensation under the separation agreement with Luna was eventually clawed back because "on April 26, 2024, the Board determined that Mr. Graeff engaged in conduct that constituted Cause and the Company will cancel all future severance payments and Mr. Graeff will forfeit all shares underlying the accelerated vesting of the 10,000 restricted stock units under the Graeff Separation Agreement."  ¶ 107.

### 3. The SOX Certifications and False Assurances of Internal Controls Are Actionable

The complaint alleges Defendants' repeated and false assurances of proper internal controls are additional false statements and are actionable. *See, e.g.*, ¶¶ 41-42. Defendants assured inventors that their controls "provide reasonable assurance regarding the reliability of financial reports and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]" ¶ 41.  These statements, as Luna later admitted, were false when made,

and were never true during the class period. A company's recognition that its previous assurances about the integrity of its financial reports and internal controls were deficient establishes that those statements were false when made. *See Lemen v. Redwire Corp.*, 2023 WL 2598402, at *3 (M.D. Fla. Mar. 22, 2023) (plaintiffs plausibly alleged internal control assurances about company's accuracy and integrity were false based on company's investigation into misconduct).

Yet Defendants contend "SOX certifications and statements regarding the effectiveness of controls are not independently actionable under Section 10(b) of the Exchange Act." MTD at 18 (citing *Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013)). There is no such bright-line rule, as Defendants' own cases illustrate. *Bruce* did not hold that SOX certifications and assurances regarding internal controls can never be actionable. Instead, the court held that the specific certification at issue was not actionable because defendant's failure to detect a fraud was not actionable. *Id.* at *3. Similarly, in *In re Silicon Storage Tec., Inc. Sec. Litig.*, 2007 WL 760535 (N.D. Cal. Mar. 9, 2007), plaintiffs alleged that the 10-Q certifications were false based on purportedly false inventory evaluations. But the court held that the false certification claim is "completely dependent on the adequacy of the [inventory] allegation," which the court held was not sufficiently pled. *Id.* at *17.

In truth, whether SOX certifications and assurances about internal controls are actionable turn entirely on the specific facts. This stands to reason, since the "fundamental purpose" of § 10(b) is to implement a "philosophy of full disclosure." *Santa Fe Indus. V. Green*, 430 U.S. 462, 478 (1977). Rule 10b-5 makes it unlawful to make untrue statements, and to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc) (superseded by statute on other grounds by 15

U.S.C. § 78u–4(b)(1)) (false internal control assurances were actionable when defendants knew assurances were false).

Finally, Defendants assert SOX certifications and internal control assurances are "statements of opinion," citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*, 856 F.3d 605 (9th Cir. 2017).[6]  But Plaintiff met the *Dearborn Heights* standard, because Plaintiff plausibly alleged that Defendants did not honestly hold the stated opinion; the opinion included an "embedded statement of fact" that is false; and the opinion omitted facts that are necessary to make the opinion not misleading.  *See id.* at 616; ¶¶ 92-100.

## B.   Defendants' Forward-Looking Statements Are Not Protected by the PSLRA Safe Harbor

Defendants next attempt to classify two statements as prospective (MTD at 21-23), and barred by the PSLRA safe harbor provision.  The first statement is from August 11, 2022, when Graeff stated in a press release that the Company's "focus and execution will carry us through the remainder of 2022 and will allow us to achieve growth in each business. This, combined with strong bookings, gives me the confidence to reaffirm our 2022 outlook." ¶ 45.   The second statement is on November 10, 2022, when Graeff stated "[w]ith three quarters now behind us, we feel very comfortable that we will finish 2022 within the ranges that we provided on our March earnings call."  ¶ 54.  But the PSLRA safe harbor provides no refuge for Defendants.

*First*, these two statements are "'mixed statements,' containing non-forward-looking statements as well as forward-looking statements." *In re Quality Sys., Inc.*

---

[6] Defendant Gomez-Quintero suggests that Plaintiff "misleading omits" the statement that the SOX certification is based on his "opinion" and "knowledge."  G-Q MTD at 6 (citing ¶ 40).  But the very next paragraph in the complaint contains a full disclosure statement, including that "[b]ecause of the inherent limitations in a control system, misstatements due to error or fraud may occur and not be detected." ¶ 41.

*Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). These statements suggest that focus and execution had been the driver of the revenue growth in the first half of 2022, which was the basis for reaffirming guidance for the remainder of 2022. Plaintiff alleges these statements regarding current and historical facts were materially false and misleading when made. § II.C. Defendants cannot avoid liability for such statements simply by combining them with revenue projections. *Quality Sys.*, 865 F.3d at 1141-42 ("the safe harbor is not designed to protect companies and their officials . . . when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement"); *see also In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) (defendants' use of "inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements").

The forward-looking portions of these two statements are also not protected under the safe harbor because, "[f]or cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1148. As such, "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate," and Defendants provided no such language here. *Id*

**Second**, even if either of the statements were purely forward looking, they were not accompanied by meaningful cautionary language that address precisely the substance of the specific challenged statement and "discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1035 (S.D. Cal. 2005). Cautionary language is not meaningful if it fails to disclose known, material facts or

-21-

states that risks may occur in the future that, in fact, have already transpired. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). Here, the purported cautionary language Defendants rely upon consists of insufficient "'vague or blanket (boilerplate) disclaimers . . . that the investment has risks.'" *Immune Response*, 375 F. Supp. 2d at 1035. For the most part, these purported warnings merely cautioned investors that the future is unknowable. MTD at 22. And they clearly never warned investors of the undisclosed improper revenue recognition. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." (alterations original)); *see also Glazer*, 63 F.4th at 780-81; *Immune Response*, 375 F. Supp. 2d at 1034-35.

## V.   THE COMPLAINT ADEQUATELY ALLEGES AN INFERENCE OF SCIENTER

Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness,'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016), and "[r]ecklessly turning a 'blind eye' to impropriety," *VeriFone*, 704 F.3d at 708. The inference of scienter "need not be irrefutable . . . or even the 'most plausible.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Nor must the scienter inference be "of the 'smoking-gun' genre." *Id.* Rather, the inference need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In evaluating the scienter allegations, the "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310. Here, numerous well-pled facts support a "strong inference" of Defendants' scienter.

## A.    The Simplicity and Obviousness of the Accounting Violations and Scope of the Required Restatement Support Scienter

Violations of "basic and fundamental principles of accounting" support scienter. *See In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *12 (N.D. Cal. Nov. 30, 2012) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009)); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (scienter established "when the relevant [accounting] provision pertains to an important company policy and as the nature of the accounting violation becomes more obvious").

Courts regard revenue recognition as a basic accounting principle that, if violated, gives rise to a strong inference of scienter. *See Patel v. Axesstel, Inc.*, 2015 WL 631525, at *12 (S.D. Cal. Feb. 13, 2015). Here, Defendants repeatedly stated that Luna accounted for revenue pursuant to GAAP.  *See, e.g.,* ¶¶ 41, 67, 70.  And Defendants' revenue inflation "were not minor accounting errors." To the contrary, the revenue inflation impacted nearly two years' worth of Luna's financials, which "strongly suggest a typical corporate executive should have noticed them." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016).

Defendants Luna and Graeff argue Luna's need to file restatements does not support an inference of scienter, citing *In re WatchGuard Sec. Litig.*, 2006 WL 8473541 (W.D. Wash. Apr. 21, 2006).  MTD at 9.  But in *WatchGuard*, the defendants simply made a mistake in calculating early pay incentive discounts, and defendants consistently and publicly ***disclosed*** its erroneous assumption underlying these misstatements.  *Id.* at *5. As the court explained, "[c]onsistent disclosure of the erroneous premise that led to the repeated mis-classification is consistent with WatchGuard's ignorance of the error, not with any Defendant's intent to deceive or deliberate recklessness."  *Id.*  Defendants' superficial summary of *WatchGuard* omits this critical distinction from the instant case.

-23-

Next, Defendants rely on *Ezzes v. Vintage Wine Estates, Inc.*, 2024 WL 895018, at *3 (D. Nev. Mar. 1, 2024), but they again elide the true holding of the case. *Ezzes* involved a GAAP principle related to inventory write-downs, but plaintiffs failed to allege that (a) defendants knew what the accounting principle was; (b) the principle was violated; or (c) defendants knowingly violated the principle. *Id.* at *11. The court also concluded the inventory write-down principle involved subjective judgment. *Id.* Defendants' reliance on *Ezzes* only emphasizes the gravity of their violations of objective accounting principles.

More on point is *Kaltman*, where the court held plaintiffs met the scienter requirement for the corporation and its former CEO and CFO, based largely on financial restatements. As the court held, Key Energy's "'need to file a restatement, although not dispositive, adds weight to the scienter calculus due to the magnitude of the Restatement. When the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations *may shift significantly in favor of scienter*.'" 447 F. Supp. 2d at 664 (cleaned up). The court noted the corporation's financial statements were certified by the individual defendants, which "adds weigh to Plaintiffs' allegations of strong inference of scienter." *Id.* Finally, the CEO's termination supported scienter because he was terminated "for cause." *Id.*

*In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) also supports scienter here. As *Adaptive* explained, while restatements are "insufficient to support a scienter inference on their own, when coupled with [] strong evidence of deliberately reckless accounting, these restatements shore up and place in context the allegations of fraud" *Id.* at *14. Notably, *Adaptive* only involved *two* quarterly restatements, which pales in comparison to the seven quarters for which Luna still has not issued restatements, and another four quarters where Luna did not release any financial statements at all. *See supra* § II.C-E.

-24-

## B. The Timing of the Individual Defendants' Departures Strongly Support Scienter

The timing and nature of Executive Defendants' departures strongly support scienter as well. Defendant Graeff "retired" on March 25, 2024 – thirteen days after the Company first announced the need to issue financial restatements and the formation of a "special" investigative committee. ¶ 97. Defendant Gomez-Quintero "retired" five weeks later during the pendency of the independent investigation. *See*, *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1188 (C.D. Cal. 2007) (finding support for scienter where officer resigned in connection with an internal investigation); *In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 7022753, at *10 (N.D. Cal. Jul. 18, 2007) (finding evidence of scienter where officer's retirement was announced in close proximity to the company's restatement). The Company also announced that "***[i]n connection with his resignation, Mr. Gomez-Quintero is not entitled to receive any severance or other benefits upon his separation from the company***." ¶ 106. On that same day (May 1, 2024), Brian Soller, the CTO and Executive V.P. of Corporate Development, was fired (¶ 105), and Defendant Graeff's compensation was clawed back due to a finding of "cause" based on his failure to cooperate in the internal investigation. ¶ 108. Finally, Nestro left the Company in October 2023 ¶ 13, just five months before the Company's acknowledgment that financial restatements were necessary.

These executive departures, terminations, and decisions to withhold bonuses and compensation all strongly support scienter. *See, e.g.*, *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (Board's decision to claw back compensation from the individual defendants weighed in favor of a strong inference of scienter). They mostly occurred soon after the formation of the special investigative committee, and the stated need to issue restatements. It is highly probable (and a logical inference) that their departures and terminations are based on initial findings of the investigatory committee, which strongly supports scienter.

*See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (defendants' terminations and resignations, occurring at the same time as company's restatement, "add one more piece to the scienter puzzle."). At a minimum, that the Board acknowledged an ongoing lack of internal controls (¶ 93) is an additional fact that should be considered in the "scienter puzzle." *Adaptive*, 2002 WL 989478, at *14 (corporate reshuffling while company was restating financials added to "scienter puzzle"); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) (various remedial measures, including terminations and segregation of duties, combined with restatement, established "strong inference that the company itself believes that fraud led to materially misleading financials").[7]

Defendants contend *Zucco* held resignations support an inference of scienter "*only*" when the resignation was uncharacteristic or accompanied by suspicious circumstances." MTD at 11; *see also* GQ MTD at 10. This is not what *Zucco* held; it simply noted that, in the absence of these allegations, an inference of scienter would not be as "cogent" or "compelling." 552 F.3d at 1002. And *Zucco* involved the "bare fact" of the former CEO's retirement. *Id.* Here, there is much more, including seven quarters of financial statements that still have not been corrected, a separation agreement that required Graeff to cooperate in the internal investigation, and revocation of his compensation based on a "cause" finding when he failed to cooperate in that investigation.

In addition to these allegations, for Defendant Gomez-Quintero, the Board announced his resignation on the same day it announced the termination of Brian

---

[7] *See also Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ("because the changes in management occurred while Isilon was preparing its own internal investigation of revenue recognition practices, the departures 'add one more piece to the scienter puzzle.'") (citing *Adaptive*); *Richard v. Northwest Pipe Co.*, 2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) (same).

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

Soller (former CTO and EVP of Corporate Development), and the Board pointedly noted that "***in connection with his resignation,*** Mr. Gomez-Quintero is not entitled to receive any severance or other benefits upon his separation from the Company." ¶ 106.  Here, the Court does not need to speculate whether Defendant Gomez-Quintero's "resignation" was under "suspicious circumstances"; the Board—by exacting a financial penalty "in connection with" his resignation—confirmed that it was.  *See Adaptive*, 2002 WL 989478, at *14 (inference of scienter when severance payments to two defendants were suspended, along with restatement of financials and company's internal investigation).; *see also*, *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 347 (D.N.J. 2007) ("a defendants resignation could constitute a 'piece to the scienter puzzle' if the resignation both takes place within a couple of months of the announcement of the errors committed and is accompanied by an extraordinary corporate punishment measure, e.g., denial of severance payment."). Finally, Defendant Nestro argues the complaint fails to adequately allege scienter, but he neglects to account for the allegations as a whole.  Nestro MTD at 4.  For example, he contends that the "bare allegation" he signed "a" false financial statement does not establish scienter. Nestro MTD at 4.  But this omits the fact that he signed ***six*** false statements, as CFO, which the Company admitted were false, and made numerous false statements about the Company's revenue, all before he abruptly resigned.  ¶¶ 40, 49, 56, 65, 75, 82; *see also* § II.C.  These allegations are more than sufficient to establish Defendant Nestro's scienter.  *See Adaptive*, 2002 WL 989478, at *14.

**C.  Graeff's Failure to Cooperate with the Internal Investigation Supports Scienter**

Courts have repeatedly recognized that insiders' non-cooperation with an investigation into fraud further supports an inference of fraud. *See Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1187 (executive's resignation and refusal to cooperate with special committee investigating wrongdoing warranted inference of scienter); *Katz*

*v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 274 (S.D.N.Y. 2008) (individual defendants' obstruction of audit committee investigation into challenged practice gave rise to inference of fraudulent intent).

Here, on May 1, 2024, Luna stated that, under the terms of the Settlement Agreement with Defendant Graeff, "all cash severance payments" and "all shares underlying the restricted stock units" were subject to "recoupment or immediate forfeiture" upon a finding of "cause" by the Company. ¶ 107. The Board further concluded that Defendant Graeff "engaged in conduct that constituted Cause," and all future severance payments and all pending stocks vestings were terminated. *Id*. This is strong evidence of scienter.

Defendants aver the Board's for-cause determination "does not change the calculus," citing *City of Los Angeles v. Bankrate, Inc.*, 2015 WL 11438106 (S.D. Fla. Nov. 23, 2015) and *Comm's Workers of Am. Plan for Emps. Pensions & Death Benefits*, 2007 WL 951968 (D. Ariz. Mar. 28, 2007). But neither case involved a former CEO's refusal to cooperate with an internal investigation. Nor did either case involve a series of admittedly false statements made by the defendant that remain uncorrected.

**D. Luna's Decision to Avoid Providing Future Financials Is Relevant to Scienter**

As detailed above, Luna failed to issue corrected statements for seven quarters, and failed to issue any correct financial statements at all for over a year. *See* § II.C.D. The Company has also ceased all conferences with analysts and investors, including refusing to hold its required annual shareholders' meeting. These facts support scienter as well. *See Kaltman*, 447 F. Supp. 2d at 664 (finding scienter in part when "the restatement has yet to be released.").

Defendants mischaracterize these developments as mere post-class "statements" irrelevant to scienter. MTD at 13. But Plaintiffs allege the *facts* – not

statements – are relevant here, because the wrongdoing was so egregious that Defendants have chosen to conceal the truth to this day.

Defendants next suggest that Luna's purported cooperation with Nasdaq shows that it "is not hiding anything from anyone. The Company simply wants to figure out what happened, correctly report the impact of the restated financials to investors, and prevent similar issues from occurring again." MTD at 13-14. This argument may have been *slightly* more persuasive if Luna had actually reached a deal with Nasdaq. *See* § II.E. Defendants further stretch the point when they claim the restatements are "upcoming," but then claim that the delay simply reflects its "thorough review." MTD at 14. This is nonsense; Luna's failure to disclose is not the result of a thorough review, but a cost-benefit analysis in weighing the price the Defendants may pay if they come clean about the fraud.

**E.     Defendants Held Themselves Out as Knowledgeable Regarding Luna's Revenues**

Defendants' statements evincing their knowledge of the Company's business and revenues further supports scienter. *Reese v. Malone*, 747 F.3d 557, 571, 576 (9th Cir. 2014) (scienter supported by senior executive who discussed topic publicly with purported knowledge). Here, Defendants spoke frequently in press releases and earnings calls about the company's revenues and the drivers and sources for the performance (¶¶ 35, 36, 37, 45-47, 53-54, 60, 73, 80, 86), they repeatedly falsely certified that Luna's financial statements were true and accurate (¶¶ 40, 49, 56), and they continually falsely certified that Luna's internal controls. ¶¶ 41, 75. Courts routinely find an inference of scienter supported where defendants hold themselves out as knowledgeable and where it is reasonable to assume that they knew all facts known to the corporation about that subject. *See also Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (repeated public discussion of closely tracking key metrics supports inference of scienter); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) (repeated discussion "cross-

selling scheme [as] critical to the company's success and growth prospects" supports inference of scienter).

Defendants never address these specific allegations. Instead, Defendants Luna and Graeff contend the complaint "devotes only two short paragraphs to the scienter requirement," and that the complaint engaged in "group pleading" by not individually identifying the defendants and the related scienter allegations. MTD at 7.[8]  But the two paragraphs Defendants cite merely *summarize* the scienter allegations to argue Plaintiff's allegations are *limited* to those two paragraphs. MTD at 7. This obvious gambit should be rejected as frivolous.

Defendant Graeff further claims that *Garcia v. J2 Glob., Inc.*, 2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) involves the "exact same" scienter allegations as those here. MTD at 7. Not so. In *Garcia*, plaintiffs asserted without basis that it was "appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in [J2's] public filings, press releases, and other publications . . . are the collective actions of Defendants." *Id.* at *18. This is textbook group pleading, and notably absent in *Garcia* were any specific allegations against individual defendants. Allegations against defendant Graeff are robust and plentiful, which he simply ignores. *See* § II.C.

**F.    Defendants Had Access to the Disputed Information**

Defendants' access to disputed information is further evidence of scienter. *Reese*, 747 F.3d at 575. The separation agreement stipulated that Defendant Graeff cooperate with an internal investigation into the false revenue statements. Luna later invoked the cause provision because Graeff was not cooperating, but the existence of that provision indisputably shows that he had first-hand knowledge of the

---

[8] In this case, the "knowledge of facts critical to a business's core operations" may be "impute[d] to a company's key officers." *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *19 (N.D. Cal. Sept. 27, 2012).

-30-

wrongdoing (if not serving as the wrongdoer himself).  It also, standing along, supports scienter. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 S. Supp. 2d 1164, 1188 (C.D. Cal. 2007) (CEO's refusal to participate in internal investigation constitutes evidence of scienter).

Defendants dispute that Graeff had "actual access" to relevant information because "Plaintiff does not include a single allegation describing which GAAP principles were violated."  MTD at 9.  But identifying the GAAP principles has nothing to do with Graeff's access to relevant information.  And Defendants have hidden from public view the GAAP principles they violated.  They should not benefit from their coverup.  *See In re Comverse Tech., Inc.*, 2007 WL 4207191, *16 (E.D.N.Y. Oct. 31, 2007).

Defendants suggest that Plaintiff merely alleged knowledge can be inferred based on job titles, but this distorts Plaintiff's actual claims.  *See supra* § II.  Graeff's repeated public comments about Luna's growth, and the supposed cause of Luna's growth, strongly supports the conclusion that he had actual access to relevant information.  *See Uniformed Sanitationmen's Assoc. Comp. Fund. v. Equinix, Inc.*, 2025 WL 39936, at *5 (N.D. Cal. Jan. 6, 2025) (strong inference of scienter when individual defendants "repeatedly discussed capital expenditures" and "commented on the reasons why" certain revenue was high and expenditures were low).

## G.    The Core Operations Doctrine Supports Scienter

When, as is the case here, "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred "without accompanying particularized allegations." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *12 (N.D. Cal. Feb. 15, 2018) (similar).

The serial misstatements of Luna's financials – spanning ***seven quarters,*** all under Graeff's watch, with Defendants Gomez-Quintero and Nestro serving as CFO

-31-

during their respective periods – is of such prominence that it would be absurd to suggest that the Defendants were out of the loop. *See id.* at \*5. At some point (as here), the mountain of allegations and admissions become too large to overcome. Indeed, "it would be absurd to suggest that management was without knowledge," *S. Ferry LP, No. 2*, 542 F.3d at 786.

**H.      Viewing Allegations Holistically, Defendants' Innocent Inference Fails.**

When viewed holistically, the Complaint's scienter allegations demonstrate a strong inference that Defendants were at least deliberately reckless. *Tellabs*, 551 U.S. at 326. Even if these competing inferences present a close question (which they do not), weighing of the inferences must be resolved in Plaintiffs' favor. *Id.*

Defendants argue otherwise, and suggest that the fracas is due to a mere "accounting error." MTD at 14. This is a risible claim. Did Luna risk the viability of its corporation as a going concern for years because it could not correct an accounting error? This is simply implausible. Equally tenuous is Defendants' claim that the 2022 Ernst & Young audit establishes a lack of scienter. MTD at 15. That audit, of course, was *based on false numbers*. Lying to your auditor does not render that auditor's report a stamp of approval of the fraud.

**VI.     THE COMPLAINT ADEQAUTELY ALLEGES SCHEME LIABILITY**

Rules 10b-5(a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business" that "operates … as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c) (scheme liability). "These provisions capture a wide range of conduct," *Lorenzo v. S.E.C.*, 587 U.S. 71, 79 (2019), which "itself can be deceptive," *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008). For scheme liability, Plaintiff must first show that Defendants employed a scheme or committed a manipulative or deceptive act that operated as a fraud or deceit. *Lorenzo*, 587 U.S. at 78. Additionally, Plaintiff must show scienter, a connection to a securities transaction (undisputed by

Defendants' motion), reliance (undisputed), economic loss (undisputed), and loss causation (undisputed). *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). The Complaint sufficiently alleges each of these elements.

Defendants' failure to correct its financial statements, and to impliedly accept delisting from Nasdaq in lieu of coming clean about its series of false statements, is compelling evidence of its fraudulent scheme. *See In re Comverse Tech., Inc.*, 2007 WL 4207191. In *Comverse*, the defendant corporation "repeatedly warned" that it had to issue financial restatements, although it had not done so as of the date of the opinion. As a result, "[t]he fact that Comverse has warned of the need to materially restate its financial disclosures weighs toward the likelihood that defendants engaged in such additional deliberate misconduct." *Id.* at p. 16 of PDF.[9] In addition, "Comverse's internal investigation into the [misconduct claims] is ongoing and has stretched out for over a year and a half. This ***significantly weighs*** toward the likelihood of wrongdoing." *Id.* (citation omitted). And "more importantly, whatever evidence exists regarding the [misconduct] is still in the hands of Comverse. . . . In other words, Comverse ***should not be rewarded because it has yet to conclude its internal investigation*** into the [misconduct] claims." *Id.* (emphasis added). Unlike Defendants here, Comverse ultimately did release amended statements, and the district court ultimately granted plaintiffs leave to amend the complaint to allege the false statements.[10]

The allegations in this case are substantially more inculpatory. Luna has refused to issue financial restatements for seven quarters running, stretching back to the first quarter of 2022 – and has ceased releasing any financial statements at all for the past year. Luna's failure to submit restatements is even more remarkable when Luna has been conducting an internal investigation for nearly a year, with legal and

---

[9] The Westlaw version is unpaginated.

[10] *See In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 154 (E.D.N.Y.).

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

financial support, and it still cannot find a way to issue reports that are not misleading. ¶ 93. In the midst of this internal investigation, Defendant Graeff resigned, and forfeited substantial stock options because he did not cooperate with the internal investigation. Brian Soller, the former CTO and Executive Vice President, was fired for cause. ¶ 105. Defendant Gomez-Quintero "resigned," and was "not entitled to receive any severance or other benefits upon his separation from the Company." ¶ 106. Luna's acting CEO, Richard Roedel, abruptly resigned "due to health reasons, effectively immediately." ¶ 110. As a result of the investigation, seven additional employees were fired as well. ¶ 107. Taken together, these "resignations" and terminations resoundingly confirm that Luna's executives and senior management had been engaged in a widespread fraud to inflate Luna's revenue. *See In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 394 n. 176 (S.D.N.Y.2007) (resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud.").

Defendant Gomez-Quintero contends that there are no allegations he engaged in any misconduct beyond the false statements. *See* G-Q MTD at 12-13 (citing *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2016 WL 6782768 (C.D. Cal. Aug. 9, 2016)). But, just as in *Comverse*, the circumstances of Gomez-Quintero's termination, including the Company's decision to financially penalize him upon termination as a result of an internal investigation, strongly support the interference that he was engaged in "additional deliberate misconduct." 2007 WL 4207191, at *16. And in *Oaktree*, the scheme allegations were merely a "recast" of the false statement allegations. 2016 WL 6782768, at *15. With the internal investigation, the failure to issue restatements, Mr. Gomez-Quintero's termination and withholding of any financial benefits, and termination of firings of other executives and employees, Plaintiff's allegations far exceed those in *Oaktree*.

## VII.   PLAINTIFF PLAUSIBLY ALLEGES CONTROL LIABILITY.

Plaintiff has provided fulsome allegations that Defendant Graeff was the spokesperson for the corporation (¶¶ 35, 36, 37, 45-47, 53-54, 60, 73, 80, 86) and certified the financial reports as true and accurate (¶¶ 40, 49, 56, 65, 75, 82, 89).[11] This is more than sufficient to allege he is a control person under Section 20(a). *See Petrie v. Elec. Game Card, Inc.*, 2015 WL 475958, at *7 (C.D. Cal. Feb. 5, 2015) (CEO who signed financial statements "sufficient to demonstrate control person status.").

Defendant Gomez-Quintero repeats his contention that he was not a "control person" prior to his arrival at the Company.  G-Q MTD at 14.  Plaintiff agrees.  He further asserts that he was not a control person when he was the Chief Financial Officer, and that the complaint merely contains "bald allegations of control."  G-Q MTD at 14-15 (citing *Golf Props.*, 2003 WL 23018761).[12]  Defendant Nestro makes a similar claim.  Nestro MTD at 5-6. But both Defendants signed off on the financial statements as CFO attesting to their accuracy, and necessarily "[did] exercise control" in that role.  *See In re Amer. Apparel, Inc. Shareholder Litig.*, 2013 WL 10914316 at *38 (C.D. Cal. Aug. 8, 2013) ("A CFO who signs financial statements

[11] All three groups of Defendants selectively quote the dicta in *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) that a CEO title standing alone "does not create a presumption that he or she is a controlling person."  MTD at 24; G-Q MTD at 14; Nestro MTD at 6.  Yet all three groups also neglect to quote the very next sentence, which held that "involve[ment] in the formulation of financial statements . . . is sufficient" to establish control.  642 F.3d at 1223.  As detailed herein, all three Defendant groups were involved in formulating financial statements and signing SOX certifications assuring their accuracy.

[12] *Golf Props.* is wildly off base, because there, the plaintiff alleged an executive defendant's status as the *wife* of another defendant made her a controlling person (in addition to her ownership interest in the company).  The court properly rejected this notion.  *See* 2003 WL 23018761, at *9.

PLAINTIFFS' OPPOSITION TO DEFENDANTS LUNA AND GRAEFF'S MOTION TO DISMISS
Case No. 2:24-cv-02630-CBM-KS

can be presumed to have control over those who make the statements.") (citation omitted).[13]  Neither Defendant offers an argument to rebut this presumption.[14]

## VIII.  CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss. If the Court grants any part of the motions, Plaintiff respectfully requests leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (finding leave to replead is routinely granted in securities cases).

Dated: January 24, 2025         Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Lucas E. Gilmore*

Lucas E. Gilmore, Bar No. 250893
Reed Kathrein, Bar No. 139304
715 Hearst Avenue, Suite 300
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email:   lucasg@hbsslaw.com
        reed@hbsslaw.com

*Counsel for Lead Plaintiff George Lang*

---

[13] Although this is not a close call, questions of control are governed by Rule 8, and not the heightened pleading standards of Rule 9(b).  *Id.* at *33 n.249 (control person liability claim "need only meet the requirements of Rule 8(a).") (citation omitted).

[14] Defendants Gomez-Quintero argues that his false statement about revenue is not actionable under Section 20(a) because he is not a "controlling person" over his own statements.  Gomez MTD at 15.  This misunderstands Plaintiff's allegations; his false statement demonstrates he is a controlling person based on his authority to release such statements, not that the statement alone is actionable under Section 20(a).