Lucas E. Gilmore, Bar No. 250893
Reed Kathrein, Bar No. 139304
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email:  lucasg@hbsslaw.com
reed@hbsslaw.com

*Attorneys for Lead Plaintiff George Lang*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LUNA INNOVATIONS INCORPORATED SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>*ALL ACTIONS* | Case No. 2:24-cv-02630-CBM-KS<br><br>**DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED (1) MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND (2) MOTION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARD**<br><br>Hearing Date: Tuesday, February 17, 2026<br>Hearing Time: 10:00 a.m.<br>Courtroom: Courtroom 8D, 8th Floor<br>Judge: Hon. Consuelo Marshall |

I, Lucas Gilmore, declare as follows:

1.     I am an attorney admitted before this Court. I am a Partner at Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), counsel for Lead Plaintiff George Lang ("Lang" or "Lead Plaintiff") and Court-appointed Lead Counsel in the above-titled action (the "Action").

2.     I submit this declaration in support of Lead Plaintiff's (1) Motion for Final Approval of Proposed Class Action Settlement and (2) Motion for an Award of Attorneys' Fees, Litigation Expenses, and Service Award (the "Fee and Expense Motion"). The following statements are based on my personal knowledge through my direct involvement in this litigation and information provided by other attorneys working under my supervision, and if called upon to do so, I could and would testify competently thereto.[1]

## I.     INTRODUCTION

3.     The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $7,300,000 for the benefit of the Settlement Class. As detailed herein, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and near-term recovery, while avoiding the significant risks of continuing litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount.

4.     The proposed Settlement is the result of extensive efforts by Lead Plaintiff and Lead Counsel, which included, among other things: (i) extensive investigation into the alleged claims asserted against Defendants, which was assisted by Lead Counsel's in-house investigator and by consultations with expertise in

---

[1] All capitalized terms not defined herein shall have those meanings as set forth in the Stipulation and Agreement of Settlement dated May 5, 2025 ("Stipulation"), attached hereto as **Exhibit 1**. Emphasis is added and citations are omitted throughout unless otherwise noted.

-2-

DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL AND MOTION FOR FEES, EXPENSES, AND SERVICE AWARD \ CASE NO. 2:24-CV-02630-CBM-KS

011245-11/3428557 V2

market efficiency, loss causation, and damages; (ii) the drafting and filing of a 44-page, highly detailed Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint," ECF No. 67); (iii) a round of motion-to-dismiss briefing; (iv) extensive settlement negotiations, which included the drafting of a substantial mediation statement and participation in a virtual mediation session with Jed D. Melnick, Esq. of JAMS on April 14, 2025, an experienced and highly respected mediator of complex class actions, ultimately resulting in the acceptance of a mediator's recommendation to settle; and (v) engaging in negotiations related to the Stipulation and its exhibits prior to its execution. From these and other efforts, Lead Plaintiff and Lead Counsel had a thorough understanding of the arguments, evidence, and potential witnesses that would inform the trial and were well-informed of the strengths and weaknesses of the claims against the Defendants at the time we achieved the proposed Settlement. Accordingly, Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interest of the Settlement Class.

5.    In addition, Lead Plaintiff actively participated in the Action and closely supervised the work of Lead Counsel, and he strongly endorses the approval of the Settlement. *See* Declaration of George Lang, attached hereto as **Exhibit 2** ("Lang Decl.").

6.    As discussed later in this declaration, the proposed Plan of Allocation—developed with the input of Lead Plaintiff's damages consultant—provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claims on a *pro rata* basis fairly based on losses attributable to the alleged fraud.

7.    In securing the proposed Settlement, Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of substantial risks. Lead Counsel prosecuted the Action on a fully contingent basis and advanced all litigation-related expenses. Accordingly, Lead Counsel solely bore the risk of an

-3-

unfavorable result, including no recovery whatsoever. Further, by the time this Action was litigated, Luna's market capitalization had collapsed, the company had been delisted from NASDAQ, it had ceased issuing public financial disclosures, and it was relying on financing from its largest investor simply to remain operational. There was a very real risk that continued litigation could have resulted in no recovery at all. Based on the efforts in achieving in the Settlement, Lead Counsel requests attorneys' fees in the amount of 30% of the Settlement Fund, and payment of $40,494.65 in litigation expenses incurred in the institution, prosecution, and settlement of the Action. As discussed more fully in the Fee and Expense Motion, the requested fee is reasonable compared to awards in other securities class actions, and considering the efforts of Lead Counsel, the results achieved in the Action, and the risks and complexity of the litigation. Lead Counsel also respectfully submits that the expenses it incurred in litigating the Action ($40,494.65) were expended for the benefit of the Settlement Class and therefore warrant approval. Finally, the requested service award for Lead Plaintiff, $3,500, is reasonable given Lead Plaintiff's substantial commitment to the Class.

## II.    BACKGROUND

### A.    Commencement of the Action

8.    On April 1, 2024, plaintiff Eyad Karzoun filed the first of several putative related class actions styled *Karzoun for Luna Innovations, Inc. et al.* (ECF No. 1), alleging violations of federal securities laws against Luna Innovations Inc., Scott A. Graeff, Eugene J. Nestro, and George Gomez-Quintero (collectively, the "Defendants"). On May 15, 2024, Lee Michael Thompson filed a related putative class action styled *Thompson v. Luna Innovations Incorporated, et al.*, No. 2:24-cv-04068 (C.D. Cal.), alleging violations of federal securities laws against Defendants.

9.    Following the submission of various motions to appoint lead plaintiffs and lead counsel, by order dated October 11, 2024 (ECF No. 47), the Court consolidated the *Karzoun* and *Thompson* actions for all purposes, appointed Mr. Lang

-4-

as Lead Plaintiff, and appointed Hagens Berman Sobol Shapiro LLP as Class Counsel in this Action.

**B.      The Comprehensive Pre-Filing Investigation, Preparation of the Complaint, and the Defendants' Motion to Dismiss the Complaint**

10.     Following Lead Counsel's appointment, I and other members of the Firm's litigation team conducted a comprehensive investigation into Defendants' allegedly wrongful acts. The investigation included, among other things, the review and analysis of (i) the Company's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) the Company's press releases and reports; (iv) the Company's website and marketing materials; (v) media reports concerning the Company and other facts related to this action; and (vi) price and volume data for Company securities.

11.     Lead Counsel also supervised and directed Kevin Naughton, an in-house private investigator employed by the firm, who conducted an investigation that involved, among other things, contacting 27 former Luna employees and other sources of relevant information. Mr. Naughton conducted 6 witness interviews.

12.     Lead Counsel further conferred with Fideres Partners LLP, an economic consulting firm, on loss causation-, market efficiency- and damage-related issues.

13.     Lead Plaintiff filed the operative Complaint on October 11, 2024. ECF No. 67. In the operative Complaint, Lead Plaintiff alleged that during the period between May 16, 2022 and April 19, 2024 (the "Class Period"), the Defendants made materially false and misleading statements in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act, which caused the price of Luna securities to trade at artificially inflated prices. *Id.* ¶ 1. Specifically, Lead Plaintiff alleged that the Defendants misled investors by failing to disclose that Luna's financial statements from May 16, 2022 to November 14, 2023 improperly recognized unearned revenue, would require restatement, and were supported by ineffective disclosure controls and

procedures that did not provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. *Id.* ¶¶ 32–91. As a result, the company's public statements about its business and prospects were materially false or lacked a reasonable basis. *Id.* Lead Plaintiff alleged that persons who purchased Luna securities during the Class Period suffered economic losses when the price of Luna securities declined as a result of a series of corrective disclosures between March 12, 2024, and April 25, 2024. *Id.* ¶¶ 92–103.

14. On December 10, 2024, Defendants filed three separate motions to dismiss the Complaint, totaling 47 pages of substantive briefing, along with dozens of supporting documents. ECF Nos. 70, 71, 73. Defendants challenged virtually all aspects of the Complaint, asserting that it should be dismissed for multiple reasons: that it failed to plead falsity with specificity, relying instead on a pending restatement without identifying violated GAAP principles or clearly false statements; that it lacked particularized allegations of materiality, improperly inferring it from hindsight and a stock drop; and that it did not adequately plead scienter, relying on executive titles and personnel changes without citing insider knowledge or supporting evidence. Additionally, Defendants contended that the scheme liability claim merely repackages the alleged misstatements without alleging distinct manipulative conduct, and that the Section 20(a) control person claims failed due to the lack of a primary violation and insufficient allegations showing actual control by certain executives over the false statements.

15. Lead Plaintiff opposed the motion on January 24, 2025 (ECF No. 76), filing an omnibus opposition containing 36 pages of briefing, as well as a request for judicial notice of a supporting document. ECF No. 77. To prepare the opposition to Defendants' motions to dismiss, Lead Plaintiff undertook a comprehensive and methodical review of the amended complaint, the motions, and the applicable legal standards under the PSLRA and Rule 12(b)(6). Lead Plaintiff reexamined the full

factual record, including public filings, market data, and Luna's admissions regarding revenue misstatements and control deficiencies. Lead Plaintiff also analyzed a wide body of case law addressing falsity, scienter, and scheme liability, and carefully structured their brief to align the allegations with precedent from both the Ninth Circuit and other relevant jurisdictions. Finally, the litigation team collaborated intensively to craft a clear, persuasive narrative showing that Defendants' misconduct was not only plausible, but compellingly supported by concrete facts and judicially noticeable events.

16. In response to Defendants' motion to dismiss, Lead Plaintiff argued that the Complaint plausibly alleges securities fraud by detailing a years-long fraudulent revenue recognition scheme at Luna Innovations. Lead Plaintiff contended that Defendants' arguments fail because the company has admitted to materially false financial statements spanning multiple quarters, including admissions of GAAP violations and internal control failures, and these admissions satisfy the pleading requirements for falsity and materiality. Lead Plaintiff rejected Defendants' claim that the absence of a formal restatement nullifies falsity, noting that Luna has now announced it will not file restated financials, reinforcing the plausibility of fraud. Regarding scienter, Lead Plaintiff pointed to the obviousness of the accounting violations, the abrupt departure of key executives, including the CEO's termination for cause, and Defendants' access to relevant financial information, all of which support a strong inference of intent or recklessness. Lead Plaintiff also argued that the SOX certifications, statements about internal controls, and attributions of revenue growth were materially false and not mere puffery. Finally, Lead Plaintiff maintained that the scheme and control person liability claims are properly pled based on the active roles the Individual Defendants played in the fraud, and he urged the Court not to allow Defendants to avoid liability simply by withholding corrective disclosures.

17. Defendants filed replies in support of their motions on February 11, 2025, totaling another 29 pages of substantive briefing. ECF Nos. 79, 80, 82. In their

replies, Defendants reinforced their claim that Lead Plaintiff had failed to meet the heightened pleading standards. These briefs reflected the continued seriousness with which Defendants contested the allegations and underscored that the motion to dismiss stage was a critical battleground in the case. The reply briefs helped clarify the issues in dispute and further demonstrated that the allegations had been fully tested, positioning the Court to rule with the benefit of a complete record.

18.    On February 26, 2025, while the motions to dismiss were pending, Lead Plaintiff filed a request for judicial notice of additional documents. ECF No. 83. Lead Plaintiff identified a Form 8-K filed by Luna on February 21, 2025, as well as a letter from Ernst & Young ("E&Y") to the SEC that was attached to Luna's contemporaneously filed 8-K. *Id*. Lead Plaintiff explained that the documents in question were SEC filings, the accuracy of which are not reasonably subject to dispute, and therefore were properly subject to judicial notice. *Id*. Lead Plaintiff offered the documents to demonstrate what Luna and E&Y said to the market on or about February 21, 2025, about the circumstances leading to E&Y's resignation from the engagement to audit the Luna's consolidated financial statements for the year ended December 31, 2023 and that E&Y would not stand for reappointment as the Company's independent public accounting firm. *Id*.

19.    Defendants' motions to dismiss were set for hearing on March 11, 2025, and Lead Counsel had spent time preparing for that hearing. This preparation included further study of the operative complaint, Defendants' motions to dismiss, Lead Plaintiff's omnibus opposition, Defendants' reply briefs, and dozens of associated documents; an analysis of this Court's previous motion to dismiss rulings and oral argument practices; further legal research; and preparation of detailed outlines for the hearing. Days before the hearing, on March 6, 2025, this Court entered the Parties' stipulation withdrawing the motion papers without prejudice, vacating the upcoming hearing, and temporarily staying the action to allow the Parties to pursue private mediation. ECF No. 85.

-8-

## C.    Mediation Efforts and Settlement Negotiations

20.    During the litigation stay, the parties engaged a third-party mediator, Jed D. Melnick, Esq., of JAMS. Mr. Melnick is a highly regarded mediator and special master known for resolving over a thousand complex, high-stakes disputes worldwide. Recognized by Chambers and Partners and twice named an ADR Champion by The National Law Journal, he has been praised for his persistence, creativity, and collaborative approach.

21.    In advance of mediation, Lead Plaintiff prepared an extensive mediation brief. This process involved further detailed study of all relevant documents, formulation and analysis of various damages models, an investigation into Defendants' ability to satisfy a judgment against it, the results of other mediations in similar cases, the range of possible outcomes if the case were not to settle, and internal discussions regarding tactics and strategy.

22.    After receiving Defendants' mediation brief, Lead Plaintiff conducted a thorough review and analysis to assess the strengths and weaknesses of Defendants' positions. This included cross-referencing their arguments with the evidentiary record, testing the assumptions and methodology underlying their damages analysis, and evaluating their narrative against case law and the procedural posture of the litigation. Lead Plaintiff then conducted a series of internal strategy sessions to refine his approach, anticipate Defendants' likely moves during mediation, and prepare counterarguments and proposals grounded in both legal merit and practical leverage.

23.    The parties participated in a mediation via videoconference with Mr. Melnick on April 14, 2025. The mediation was a full-day, hard-fought process marked by extensive back-and-forth between the parties. The mediator was deeply engaged, rigorously testing the assumptions behind the parties' claims and damages analysis, and challenging both sides to justify their legal positions in the face of the defenses raised.

24. After a full day of negotiations, the Mediator issued a mediator's recommendation that the Action be settled for $7,300,000, which the Parties conditionally accepted.

25. Lead Counsel spent significant time and effort in negotiating, drafting, and revising the settlement agreement, the preliminary approval motion, and the notices to be sent to all class members.

**D.     Preliminary Approval of the Settlement**

26. On September 19, 2025, the Court issued its order granting preliminary approval to the proposed Settlement. *See* ECF No. 107.

27. The Settlement Class includes "all Persons who purchased or otherwise acquired Luna securities between May 16, 2022, and April 19, 2024, inclusive (the 'Class Period'), and were damaged thereby." *See* Stipulation at ¶ 1.40.[2]

### III.     THE RISKS OF CONTINUED LITIGATION

28. Through the non-revisionary cash payment of $7,300,000, the Settlement provides an immediate and certain benefit to the Settlement Class. As explained below, there were substantial risks that the Settlement Class might recover significantly less than the Settlement Amount—or even nothing at all—if the case were to proceed to a jury trial and was inevitably appealed.

---

[2] Excluded from the Settlement Class are: (i) the Defendants; (ii) Immediate Family Members of Defendants Scott A. Graeff, Eugene J. Nestro, and George Gomez-Quintero; (iii) any person who is or was an officer or director of Luna; (iv) any firm or entity in which Defendants have or had a majority ownership interest; (v) Luna's liability insurance carriers; (vi) any affiliates, parents, or subsidiaries of Luna; (vii) all Luna plans that are covered by ERISA; and (viii) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such. Also excluded are any Persons or entities who properly exclude themselves by filing a valid and timely request for exclusion in accordance with the requirements set by the Court. *See* Stipulation at ¶ 1.41.

-10-

DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL AND MOTION FOR FEES, EXPENSES, AND SERVICE AWARD \ CASE NO. 2:24-CV-02630-CBM-KS

011245-11/3428557 V2

## A.   Risks to Proving Liability

29.   Lead Plaintiff and Lead Counsel faced numerous risks at the motion to dismiss stage, particularly considering the PSLRA's heightened pleading standard. Throughout the litigation, Defendants strongly argued that Lead Plaintiff could not establish the elements of the Exchange Act claims.

30.   For example, as to falsity, Defendants argued that the Complaint fails to adequately plead falsity because it relies primarily on a pending restatement without specifying what GAAP principles were violated or which specific statements were false. They asserted that non-financial statements, SOX certifications, and general opinions or puffery (e.g., confidence in the business) are non-actionable. Gomez-Quintero argued that the statements attributed to him—such as a SOX certification and general performance commentary—are not shown to be false when made.

31.   As to materiality, Defendants argued that the Complaint offers no particularized allegations showing how any individual statement was materially misleading. Instead, they said that Lead Plaintiff improperly presumes materiality based on hindsight and the occurrence of a stock drop, which courts have held is not enough by itself under the PSLRA.

32.   As to scienter, Defendants asserted that the Complaint relies solely on an unreleased restatement, executive titles, and speculative inferences from personnel changes. Luna and Graeff contended that no confidential witnesses, insider stock sales, or internal documents are cited to support knowledge or recklessness, and that there are no specific allegations that the executives had access to information contradicting their public statements or that the nature of the misstatements was so obvious it would have been absurd for them to be unaware. Gomez-Quintero and Nestro separately argued that there are no individualized allegations of scienter against them at all.

33.   As to scheme liability, Defendants argued that the claim failed because the Complaint merely repackages the same alleged misstatements and omissions

-11-

DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL AND MOTION FOR FEES, EXPENSES, AND SERVICE AWARD \ CASE NO. 2:24-CV-02630-CBM-KS

011245-11/3428557 V2

under a different label. They contended that the Complaint alleged no manipulative acts or deceptive practices distinct from the alleged misstatements.

34.    As to control person liability, Defendants argued that the Section 20(a) claims must be dismissed because there is no adequately pled primary violation of Section 10(b), a necessary predicate for control person liability. Further, Gomez-Quintero and Nestro argued that the Complaint fails to allege any facts showing they had actual power or control over the individuals who made the allegedly false statements. They contended that conclusory assertions about their officer roles are insufficient, especially where the Complaint did not explain how they exercised control over the company's public disclosures or accounting decisions.

**B.    Risks to Proving Loss Causation and Damages**

35.    If Lead Plaintiff overcame the risks in proving falsity and scienter and successfully established Defendants' liability, Lead Plaintiff would have confronted challenges in establishing loss causation and class-wide damages.

36.    While Lead Plaintiff maintained that the decline in Luna's share price was fully attributable to correction of the alleged misstatements and omissions, Defendants likely would have argued that Lead Plaintiff's damages figure was inflated, contending that a multi-day drop is not recoverable in an efficient market. Defendants likely would further aver that only a portion of Lead Plaintiff's and Class's losses could be attributed to Defendants' alleged misstatements and omissions and thus Lead Plaintiff would have to disaggregate the effects of Defendants' alleged wrongdoing from other marketwide events or adverse company-specific information unrelated to the fraud. Defendants would have also likely argued that the severity of the fraud varied throughout the Class Period and therefore Defendants likely would have argued that the fraud premium was not constant throughout the Class Period, making damages difficult to prove. Defendants likely also would have challenged classwide reliance for options traders, given potential challenges to market efficiency for options.

-12-

37. Addressing these challenges would require extensive and costly expert discovery, resulting in an inevitable "battle of the experts" at the summary judgment stage and at trial.

38. Had any of Defendants' damages arguments been accepted, they could have dramatically limited—if not outright eliminated—any potential recovery for the Class.

**C.     Other Risks**

39. Barring the Settlement, this case would require the expenditure of substantial additional sums of time and money at trial and beyond, with no guarantee that any additional benefit would be provided to the Settlement Class. For example, the Defendants would have had the opportunity to challenge an individual Settlement Class Member's membership in the Class, challenge the presumption of reliance as to each class member (including Lead Plaintiff), and challenge the amount of damages due each Settlement Class Member. Such a process would have been lengthy, complex, and extremely costly. And even if the Court certified a class, Rule 23(c)(1) allows a class certification order to be altered or amended at any time prior to a decision on the merits.

40. Even if Lead Plaintiff succeeded at trial and met his burdens with respect to falsity, materiality, scienter, class-wide reliance under the "fraud on the market" presumption, loss causation, the measure of per-share damages (if any), and control person liability, the case would still be far from over. After any verdict, Defendants would almost certainly file an appeal—a process that would further extend the litigation for years and risk reversal of a verdict for Lead Plaintiff. Conversely, the Settlement confers a substantial and immediate benefit on the Settlement Class, and avoids the risks associated with obtaining a wholly speculative (though potentially larger) sum in the future.

41.	Lead Counsel carefully analyzed all these and other risks prior to reaching the Settlement and recognized that had Defendants succeeded on only one of their defenses, there would have been no recovery for the Settlement Class.

42.	Moreover, hanging over all this uncertainty is one of collectability: that Luna would continue as a going concern and would be able to satisfy any judgment ultimately obtained against it. That risk was present when counsel committed to the case and only intensified as Luna's financial condition deteriorated during the litigation.

43.	Even before this case was filed, Luna faced serious financial uncertainty. Since the issues addressed in this Action came to light, Luna's market capitalization has plummeted, it has been delisted from the NASDAQ and no longer releases statements of its financial performance. Luna has received a loan from its largest investor to keep it operating for the time being.

44.	These circumstances created a real and growing risk that, if Lead Plaintiff were to continue litigating this case, and Luna became insolvent, sthe Class would not recover anything.

45.	Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the Settlement is an exceptional result for the Class.

**D.	The Settlement is Reasonable in Light of the Potential Recovery**

46.	The Settlement is fair and reasonable when considering the full extent of available damages. If Lead Plaintiff had succeeded at trial and if the jury awarded Lead Plaintiff the maximum amount of damages (*i.e.*, Lead Plaintiff's best-case scenario), the estimated recoverable damages would have been approximately $35.3-$58.1 million. This estimate represents a theoretical ceiling and does not account for the significant downward pressure that would inevitably result from Defendants' challenges to both liability and damages, including their likely efforts to disaggregate non-fraud-related exogenous factors from the stock price declines and to scale back the alleged artificial inflation. Thus, the $7,300,000 Settlement represents

-14-

DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL AND MOTION FOR FEES, EXPENSES, AND SERVICE AWARD \ CASE NO. 2:24-CV-02630-CBM-KS

011245-11/3428557 V2

approximately 12.6–20.7% of the recoverable damages potentially available if Lead Plaintiff had fully prevailed at trial. This represents approximately 1.5 to 2.5 times the median percentage recovery for cases settled with estimated damages of $25–$74 million in 2024 (8.4%).[3] It also exceeds the median recovery in cases with similarly sized estimated damages in each of the past four years—8.4% in 2024, 8.8% in 2023, 8.5% in 2022, and 7.2% in 2021—representing approximately 1.4 to 3 times those medians.[4]

## IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REGARDING THE NOTICE PROGRAM

47.    In its Preliminary Approval Order, the Court authorized Lead Counsel to retain Epiq Class Action and Claims Solutions, inc. ("Epiq") as the Claims Administrator to supervise and administer the notice procedure for the Settlement and processing of Claims. *See* ECF No. 107 ¶ 13. In accordance with the Preliminary Approval Order, Epiq, working in conjunction with Lead Counsel: (i) mailed the Postcard Notice via USPS First Class Mail to all identified Class Members with an associated physical address, including nominees or custodians who purchased or

---

[3] *See* Cornerstone Research, *Securities Class Action Settlements, 2024 Review and Analysis,* https://www.cornerstone.com/wp-content/uploads/2025/03/Securities-Class-Action-Settlements-2024-Review-and-Analysis.pdf at Figure 5 (last accessed January 7, 2026).

[4] *See* Cornerstone Research, *Securities Class Action Settlements, 2023 Review and Analysis*, https://www.cornerstone.com/wp-content/uploads/2024/03/Securities-Class-Action-Settlements-2023-Review-and-Analysis.pdf, at Figure 5 (last accessed January 7, 2026); Cornerstone Research, *Securities Class Action Settlements, 2022 Review and Analysis*, https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf, at Figure 5 (last accessed January 7, 2026); Cornerstone Research, *Securities Class Action Settlements, 2021 Review and Analysis*, https://www.cornerstone.com/wp-content/uploads/2022/03/Securities-Class-Action-Settlements-2021-Review-and-Analysis.pdf, at Figure 5 (last accessed January 7, 2026).

acquired Luna securities during the Class Period as record owners;[5] (ii) published the Summary Notice in the national edition of *Investor's Business Weekly* and transmitted on the *PRNewswire*; and (iii) updated the website for the litigation, www.LunaInnovationsSecuritiesLitigation.com, so that copies of the Notice and Claim Form could be downloaded. *See* Blow Decl. ¶¶ 3-8, 12, 17.

48.    Collectively, the notices apprise Settlement Class Members of, *inter alia*: (i) the Settlement amount; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of Luna security; (iv) the maximum amount of attorneys' fees and expenses that will be sought; (v) the identity and contact information for a representative from Lead Counsel to answer questions concerning the Settlement; (vi) the right of Settlement Class Members to object to the Settlement; (vii) the binding effect of a judgment on Settlement Class Members; (viii) the dates and deadlines for certain Settlement-related events; and (ix) the opportunity to obtain additional information about the Action and the Settlement by contacting Lead Counsel, the Claims Administrator, or visiting the Settlement website. The Notice also details the Plan of Allocation and further explains that the Net Settlement Fund will be distributed to eligible Class Members who submit valid and timely Proofs of Claim under the Plan of Allocation.

49.    Pursuant to the Preliminary Approval Order, Epiq began mailing the Settlement Notice to potential Settlement Class Members and Nominees on October 17, 2025. *See* Blow Decl. ¶ 3. As of January 9, 2026, Epiq has disseminated more than 8,600 Settlement Notices to Settlement Class Members and Nominees. *Id.* ¶ 7.

---

[5] Epiq received from Luna a list of shareholders of record for Luna securities. *See* **Exhibit 3**, Declaration of Eric Blow ("Blow Decl.") ¶ 5. In addition, Epiq has developed and maintained a proprietary database with names and addresses of the largest and most common nominee holders, including brokerage firms, banks, and financial institutions. *Id.* These data were used to provide Notice of the Settlement. *Id.* ¶ 5.

50. On October 27, 2025, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in the *Investor's Business Weekly* and transmitted on the *PRNewswire*. *Id.* ¶ 12.

51. Epiq also updated and currently maintains the dedicated litigation website, www.LunaInnovationsSecuritiesLitigation.com, which provides potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and other relevant documents. *See id.* ¶ 17. Lead Counsel also provided information on the Settlement on its own website, www.hbsslaw.com. Lead Counsel and Epiq will monitor and update the website as the settlement process continues. For example, Lead Plaintiff's briefing in support of final approval of the Settlement and Lead Counsel's papers in support of the fee and expense application will be made available on the website after they are filed. Any orders entered by the Court in connection with these motions will also be posted.

52. The deadlines for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or the fee and expense application is January 27, 2026. *Id.* ¶ 9. To date, there have been no objections to the Settlement, the Plan of Allocation, and/or Lead Counsel's request for fees and expenses. Lead Counsel will file reply papers on or before February 10, 2026, addressing all objections that may be received.

## V. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

53. Pursuant to the Preliminary Approval Order, and as set forth in the notices, Settlement Class Members who want to be eligible to receive a distribution from the Net Settlement Fund must submit a valid Claim with all required information postmarked (if mailed) or submitted online no later than January 16, 2026. As detailed in the notices, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to proposed Plan of Allocation.

-17-

54. Lead Plaintiff engaged a damages consultant to assist in developing the Plan to allocate the Settlement proceeds among Claimants with the goal of reimbursing Settlement Class Members in a fair and reasonable manner. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action.

55. The Plan of Allocation is set forth at pages 11-18 of the Notice. *See* Blow Decl., Ex. D, at pp. 11-18. As described in the Notice, calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund. *See* Notice ¶ 11.

56. For the Plan of Allocation, Lead Plaintiff's expert calculated the estimated amount of artificial inflation in the per-security closing price of Luna security, which was allegedly proximately caused by Defendants' alleged material false and misleading statements and omissions during the Class Period. *See id.* ¶ 12. In calculating the estimated artificial inflation, the expert considered price changes in Luna securities in reaction to certain public announcements allegedly revealing the truth concealed by Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. *Id.* ¶ 15. The estimated artificial inflation in Luna securities during the Class Period is set out in Table 1 of the Notice. *Id.* at p. 17.

57. Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Luna security that is listed on a Claimant's Claim Form and for which adequate documentation is provided. In general, Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the prices of Luna security at the time of purchase or acquisition and at the time of sale (*i.e.*, the difference between the actual purchase price and sale price). *See id.* ¶¶ 17, 20. Accordingly, to have a Recognized Loss under the Plan of

-18-

Allocation, a Claimant must have purchased or otherwise acquired Luna securities during the Class Period (May 16, 2022, through April 19, 2024, inclusive) and held such Luna securities through the alleged corrective disclosure that removed artificial inflation from the price of Luna securities. *Id.*

58. Recognized Loss Amounts will depend upon several factors, including the date(s) the Claimant purchased/acquired their Luna securities during the Class Period and whether such shares were sold and, if so, when and at what price, considering the PSLRA's statutory limitation on recoverable damages. *See id.* ¶¶ 22, 24, 26.

59. The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases/acquisitions of Luna securities during the Class Period is the Claimant's "Recognized Claim." *See id.* ¶ 29. The Plan of Allocation limits a Claimant's Recognized Claim to his, her, or its Market Loss in Luna securities transactions during the Class Period. *Id.* ¶¶ 34-35. Specifically, if a Claimant suffered an overall Market Loss but the Market Loss was less than the Claimant's Recognized Claim, then the Claimant's Recognized Claim will be limited to the amount of the Market Loss. *Id.* If a Claimant had a Market Gain, the value of the Claimant's Recognized Claim will be zero and the Claimant will still be bound by the Settlement. *Id.*

60. As detailed in the Notice, assuming all eligible Settlement Class Members submit valid claims, on average, the estimated recovery per share for a Settlement Class Member is $0.54 per share, before the deduction of any Court-approved fees, expenses, and costs. *Id.* at p. 2. If fewer than all Settlement Class Members submit timely and valid Proofs of Claim, the distribution per share will be higher. *Id.*

61. One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants, with a maximum of 6.68% of the Net Settlement Fund available for Option-based claims. *See id.* ¶ 28. If the sum total of Recognized Claims

-19-

of all Authorized Claimants is greater than the Net Settlement Fund, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund. *See id.* ¶ 36. The *pro rata* share or "Distribution Amount" will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* If the Net Settlement Fund exceeds the sum total of the Recognized Claims of all Authorized Claimants entitled to receive payment out of the Net Settlement Fund, the excess amount in the Net Settlement Fund will be distributed *pro rata* to all Authorized Claimants entitled to receive payment. *Id.* ¶ 37.

62. If any funds remain after the initial *pro rata* distribution, subsequent cost-effective distributions to Authorized Claimants will be conducted. *Id.* ¶ 38. When the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution will not be cost effective (*i.e.*, if an Authorized Claimant would receive less than $10.00), the remaining funds will be donated to a *cy pres* recipient to be determined by the Court. *Id.*

63. Per the Court's preliminary approval order, once the Claims Administrator, Epiq, has considered a timely submitted Proof of Claim, it shall determine whether the claim is valid, deficient, or rejected. *See* ECF No. 107 ¶ 21(d). If a Claim is determined to be deficient or rejected, Epiq will send a deficiency or reject letter, as appropriate, describing the basis of the deficiency or rejection. The Claimant would then have twenty (20) calendar days to cure the deficiency or contest the rejection, including through a review by the Court. *Id.*

64. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered as a result of purchases of Luna securities attributable to the misconduct alleged in the Action. To date, no objections to the proposed Plan of Allocation have been received.

## VI.   THE FEE AND EXPENSE APPLICATION

65.   Along with seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel is applying for an award of attorneys' fees and payment of litigation expenses incurred during the course of the Action. Specifically, Lead Counsel is applying to the Court for an award of attorneys' fees of 30% of the Settlement Fund (the "Fee Application") and payment of litigation expenses from the Settlement Fund in the amount of $40,494.65. Along with the litigation expenses, and in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4), Lead Counsel further requests $3,500 for the value of time that Lead Plaintiff Lang dedicated to the Action (the "Expense Application"). The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee and Expense Motion.

66.   The primary factual bases for Lead Counsel's requested fee and expenses are summarized below.

### A.   The Fee Application

#### 1.   The work performed by Hagens Berman Sobol Shapiro LLP.

67.   Hagens Berman devoted substantial time to the prosecution of the Action. As described above in greater detail, the work that Lead Counsel performed in the Action included, among other things: (i) extensive investigation into the alleged claims asserted against Defendants; (ii) the drafting and filing of a 44-page, highly detailed Amended Consolidated Class Action Complaint; (iii) a round of motion-to-dismiss briefing; (iv) extensive settlement negotiations, which included the drafting of a substantial mediation statement and participation in a virtual mediation session with Jed D. Melnick, Esq. of JAMS on April 14, 2025, an experienced and highly respected mediator of complex class actions, ultimately resulting in the acceptance of a mediator's recommendation to settle; and (v) engaging in negotiations related to the Stipulation and its exhibits prior to its execution. Lead Counsel believes that this work was necessary for the successful litigation of the case.

-21-

68.    Based on my involvement in the Action as well as the review of time records reflecting work performed by attorneys and professional support staff employees at Hagens Berman in the Action ("Timekeepers"), I directed the preparation of the chart set forth as **Exhibit 4** hereto. The chart is a detailed summary indicating the amount of time spent by each Hagens Berman attorney and professional support staff employee who worked on the Action from its inception through January 12, 2026.

69.    The chart in **Exhibit 4**: (i) identifies the name and positions (*i.e.*, titles) of the Timekeepers who have spent time working on any matters related to the Action; (ii) states the total number of hours that each Timekeeper spent on that work from the inception of counsel's initial investigation through January 12, 2026; (iii) lists each Timekeeper's currently hourly rate[6]; and (iv) sets forth the lodestar for each Timekeeper (and for my firm as a whole). The information summarized in this chart was prepared from time records maintained by my firm in the ordinary course of business, which are available at the request of the Court.

70.    Lead Counsel expended a total of 1,163.3 hours in the investigation, prosecution, and resolution of the Action from its inception through January 12, 2026. The resulting total lodestar for Lead Counsel is $902,385.00 (consisting of $739,212.50 for attorneys' time and $163,172.50 for professional support staff time).

71.    As required under the Northern District of California's Procedural Guidance for Class Action Settlements, attached hereto as **Exhibit 5** is a billing category-based summary chart of the work performed by the attorneys and professional support staff employees in connection with investigating, prosecuting, and resolving the Action. This chart contains the following billing categories:

---

[6] The hourly rates of Lead Counsel range from $800 to $1,350 per hour for partners, $525 to $900 per hour for other attorneys, $375 to $450 per hour for paralegals, and $500 per hour for the investigator. These hourly rates are reasonable for this type of complex securities litigation. *See* Fee and Expense Motion § III.A.4.

-22-

(1) **Factual Investigation**: This category includes time spent on Lead Counsel's extensive investigation into the claims asserted in the Complaint, including reviewing the public record and identifying, contacting, and interviewing potential confidential witnesses; initial case development; and analysis of clients' and class losses.

(2) **Pleadings**: This category includes time spent preparing and filing the motion for appointment of lead plaintiff and lead counsel, as well as time spent on drafting, revising, and filing the Complaint, and the time incurred in researching and drafting Lead Plaintiff's opposition to the Defendants' motions to dismiss. This category also includes time incurred in attending to the filing of these documents.

(3) **Case Management/Client Communication**: This category includes time incurred for case management and administrative tasks, including maintaining internal calendars for deadlines. This category also includes time spent by counsel and staff preparing and negotiating case management statements, stipulations, and proposed scheduling orders, as well as preparing *pro hac vice* motions. This category also includes time incurred communicating with Lead Plaintiff regarding all aspects of the Action and preparing status reports and memoranda at various stages of the cases.

(5) **Court Appearances/Preparation**: This category includes time spent preparing for the hearing on the Defendants' motion to dismiss before the parties requested that the hearing be taken off the calendar to pursue mediation.

(6) **Experts/Consultants**: This category includes time incurred in researching and identifying potential experts.

(7) **Settlement/Mediation**: This category includes time incurred in extended settlement negotiations with the Settling Parties, with the assistance of Jed D. Melnick, Esq. of JAMS; drafting the mediation statements for Mr. Melnick; drafting and negotiating the term sheet, Stipulation, and related settlement documents; selecting the Claims Administrator and Escrow Agent; preparing the motion for preliminary approval of the Settlement; preparing for the preliminary approval hearing; preparing the final approval motion; and all other settlement-related work, through January 12, 2026.

(8) **Litigation Strategy/Analysis**: This category includes time devoted to overall litigation strategy and analysis.

72. Lead Counsel anticipates spending additional time that includes drafting a reply to the fee application and the motion for final approval, preparing for and attending the final approval hearing, responding to class member inquiries, preparing a Motion for Distribution of the Net Settlement Fund, and distributing the Net Settlement Fund. Implementing the Settlement and claims administration will also

require additional work. Lead Counsel will not seek additional compensation for this work, and as a result, the multiplier will diminish.

73. The hourly rates for the Timekeepers, as set forth in **Exhibit 4**, are the same as those set by my firm for each listed Timekeeper (*e.g.*, partner, associate, paralegal, etc.), and are consistent with the hourly rates submitted by my firm to state and federal courts in other contingent securities class action litigations across the country. The firm's hourly rates are set based on a periodic review of rates charged by firms performing comparable work and/or rates regularly submitted to other courts as the basis for the contingent fee awards in comparably complex class actions, including a review of both plaintiff and defense firm rates for complex litigation. Different Timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, years in their current position (*e.g.*, years as a partner), relevant experience, and relative expertise. For personnel who are no longer employed by the firm, the "current rate" used for the lodestar calculation is the rate that was used for that person in their final year of employment with the firm.

74. The requested fee of 30% of the Settlement Fund ($2,190,000, plus interest) therefore represents a 2.43 multiplier of Lead Counsel's lodestar. Such a request is comparable to lodestars awarded in class actions involving contingency fee risk in the Ninth Circuit and is warranted given the exceptional recovery for the Settlement Class.

**2.      Expertise, experience, and work performed by core team members.**

75. The expertise and experience of lead counsel is another important factor in setting a fair fee. As demonstrated by our firm resume, attached hereto as **Exhibit 6**, Hagens Berman is among the most experienced and skilled practitioners in the complex litigation field and has a long and successful track record in such cases. Hagens Berman is a nationally recognized law firm, with offices in Berkeley, Seattle,

-24-

Boston, Chicago, Los Angeles, San Diego, Phoenix, New York, London, and Paris. We have been consistently rated by the National Law Journal in the top ten of plaintiffs' firms in the country. The firm has extensive experience litigating complex class actions involving securities, investment fraud, product liability, tort, antitrust, consumer fraud, employment, environmental, and ERISA cases.

76.     Based on the work of the firm, Hagens Berman has demonstrated a willingness and ability to prosecute complex cases. Hagens Berman made clear throughout settlement discussions that Lead Plaintiff would not accept a low-value settlement. This negotiating position undoubtedly added valuable leverage in the settlement negotiations, ultimately resulting in the recovery for the Class.

### 3.     Standing and caliber of opposing counsel.

77.     The Defendants were represented in this matter by King & Spalding LLP; Jenner and Block LLP; Morgan, Lewis & Bockius LLP; and Goodwin Procter LLP, firms with national reputations for the tenacious defense of class actions and other civil complex matters. Faced with this experienced and formidable opposition, Lead Counsel was able to develop a case that was sufficiently strong to persuade the Defendants to settle the case on terms that were highly favorable to the Class.

### 4.     This was a high-risk litigation undertaken on a fully contingent basis.

78.     Hagens Berman has prosecuted this litigation on a contingent basis without any promise of compensation and was well-aware that any compensation would depend on the result achieved in the case and the Court's discretion in awarding fees and expenses. This has posed a significant risk that my firm will not be compensated for its work on this case. Nonetheless, Hagens Berman was obligated to ensure that sufficient resources were dedicated to the prosecution of this case, that funds were available to compensate attorneys and staff (who have had to forgo other legal work for which Hagens Berman could have been compensated), and to cover the considerable litigation costs required by a case like this one. With an average lag

time of many years for complex cases like this one to conclude, the financial burden on contingent-fee counsel is far greater than one a firm that is paid on an ongoing basis.

79. As discussed above, this case presented additional multiple risks and uncertainties that could have prevented any recovery whatsoever. In particular, Luna is on the brink of insolvency, and absent a settlement, there is a significant possibility that the company would not have the assets to pay any adverse judgment against it, in which case investors would receive nothing. This additional recovery risk, not present in the typical lawsuit, further demonstrates that this settlement is an exceptional result for the Class.

80. In the face of these substantial risks and uncertainties, Hagens Berman's extensive efforts achieved a significant recovery for the benefit of the Class. Accordingly, we respectfully submit that the requested fee is reasonable and should be approved.

**5.     The reaction of the Class to the fee request.**

81. As noted above, as of January 9, 2026, more than 8,600 copies of the Settlement Notice have been disseminated. *See* Blow Decl. ¶ 7. The Notice advised potential Class Members that Lead Counsel would apply for an award of attorneys' fees in amount not to exceed 30% of the Settlement Fund. *See* Notice at p. 2. To date, no objections to the maximum potential attorneys' request set forth in the Notice have been received by Lead Counsel or entered on the Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by February 10, 2026.

**6.     Lead Plaintiff Lang supports the fee request.**

82. As set forth in the declaration submitted by Lead Plaintiff Lang, Lead Plaintiff has concluded that Hagens Berman's requested fee is fair and reasonable based on the work performed, the recovery obtained by the Class, and the risks in the litigation. *See* Lang Decl. ¶ 7. Lead Plaintiff has been very involved in this case since

-26-

DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL AND MOTION FOR FEES, EXPENSES, AND SERVICE AWARD \ CASE NO. 2:24-CV-02630-CBM-KS

011245-11/3428557 V2

its earliest stages, and his endorsement of the fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award. *Id.* ¶ 5.

**7.    The requested fee is fair and reasonable.**

83.    In sum, Hagens Berman accepted this case on a contingency basis, committed significant resources to it, and prosecuted it for almost two years without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, we respectfully submit that a fee award of 30%, which equates to a multiplier of 2.43, is fair and reasonable, and is supported by the fee awards courts in this Circuit and others have granted in other comparable cases.

**B.    The Expense Application**

84.    Lead Counsel seeks a total of $40,494.65 in litigation expenses to be paid from the Settlement Fund. This includes expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the Action. Lead Counsel also seeks $3,500 for the costs and expenses incurred by Lead Plaintiff directly related to his representation of the Class. Lead Counsel respectfully submits that the request for reimbursement of litigation expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

85.    The Notice informed potential Class Members that Lead Counsel would be seeking reimbursement of expenses not to exceed $150,000, as well as a service award for Lead Plaintiff in the amount of $3,500. *See* Notice at p. 2. No objections have been raised as to these requests set forth in the Notice. If any objections to the reimbursement of litigation expenses or the service award is made after the date of this filing, Lead Counsel will address it in the reply papers.

86.    From the inception of the Action, Lead Counsel were aware that it might not recover any of the expenses incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was

-27-

successfully resolved. Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Thus, Lead Counsel took significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

87.    The expenses for which reimbursement is requested are summarized in **Exhibit 7** hereto.

88.    The following is additional information regarding certain of the expenses set forth in **Exhibit 7**.

(1)    **Airfare**: $1,298.92. This amount includes expenses for airfare for Nathan Emmons to travel to Los Angeles, California, for the preliminary and final approval hearings.

(2)    **Expert Fees**: $14,530.00. Lead Plaintiff retained Fideres as his expert damages consultant. Fideres assisted in evaluating loss causation and market efficiency and estimating damages during Lead Counsel's investigation, as well as in developing the Plan of Allocation.

(3)    **Overnight Shipping**: $252.41. In connection with prosecuting the Action, Hagens Berman incurred charges associated with overnight delivery via UPS.

(4)    **Court Fees/Filing Fees**: $937.25. This amount includes: (i) court filing fees; (ii) fees paid to various courts to obtain Certificates of Good standing for submission with Central District of California *pro hac vice* applications; and (iii) Central District of California admission fees for Hagens Berman attorneys.

(5)    **Hotel**: $489.93. This amount includes expenses for hotel accommodations in Los Angeles, California, for Nathan Emmons related to the preliminary approval hearing and final fairness hearing.

(6)    **Meals**: $268.06. This amount includes meal expenses related to the preliminary approval hearing and final fairness hearing.

(7)    **Online Services/Legal Research (LexisNexis/Westlaw/PACER)**: $1,741.98. During the course of the Action, Hagens Berman incurred costs associated with online legal and factual research necessary to the investigation, prosecution, and obtainment of the Settlement. These expenses include charges from online vendors such as Westlaw, LexisNexis, Courtlink, PACER, and others, and reflect costs associated with obtaining access to court filings, financial data, and performing legal and factual research. This expense amount represents the amount billed by the vendor.

-28-

(8) **Messenger/Process Service**: $2,437.05. The amount reflects payments made to messenger and process servers for performing service of various documents on the defendants.

(9) **Mediation Fees**: $17,500.00. The parties retained Jed D. Melnick, Esq. of JAMS to assist with settlement negotiations in the Action. The Parties conduct a mediation session with Mr. Melnick in April 2025.

(10) **Transportation/Travel/Expenses (Taxi, Car Rental, Train)**: $495.80. These limited travel expenses are related to the preliminary approval hearing and final fairness hearing.

(11) **Internal Prints/Copies at $0.25 per page**: $543.25. Hagens Berman incurred costs related to document printing and reproduction. Each time a photocopy is made or a document is printed, Hagens Berman's billing system requires that a case or administrative billing code be entered into the copy machine or computer being used.

89. The expenses incurred by Hagens Berman in the Action are reflected in the books and records of my firm. These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record for the expenses incurred. I believe these expenses were reasonable and expended for the benefit of the Settlement Class.

90. Finally, Lead Plaintiff seeks reimbursement of his reasonable costs and expenses incurred directly in connection with representing the Class in the amount of $3,500. The effort devoted by Lead Plaintiff to the Action is detailed in the accompanying declaration. *See* Lang Decl. ¶ 5. Lead Counsel respectfully requests that the Court grant Lead Plaintiff's request in full.

## VII.   CONCLUSION

91. For all the reasons set forth herein, Lead Counsel respectfully submits that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested attorneys' fees in the amount of 30% of the Settlement Amount should be approved as fair and reasonable, and the request for reimbursement of $40,494.65 in litigation expenses and the service award of $3,500 for Lead Plaintiff should also be approved.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

DECLARATION OF LUCAS E. GILMORE IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL AND MOTION FOR FEES, EXPENSES, AND SERVICE AWARD \ CASE NO. 2:24-CV-02630-CBM-KS

011245-11/3428557 V2

Executed this 13th day of January 2026 in San Diego, California.

/s/ *Lucas E. Gilmore*
Lucas E. Gilmore

-30-